UNITED STATES, Appellant

v

RODGER D. THOMAS, Airman, U. S. Navy, and
DENNIS G. McCLELLAN, Airman, U. S.
Navy, Appellees

13 USCMA 278, 32 CMR 278

No. 15,741

September 7, 1962

*Major Elvin R. Coon, Jr.,* USMC, argued the cause for Appellant, United States.

*Fred W. Shields, Esquire,* argued the cause for Appellees, Accused. With him on the brief was *Lieutenant Colonel William H. Bennison,* USMC.

## Opinion of the Court

KILDAY, Judge:

The accused herein, Thomas and McClellan, were tried in common by general court-martial. Separate charges against the pair alleged the offenses of conspiracy to commit rape, rape, and lewd and lascivious conduct, in violation of Articles 81, 120, and 134, Uniform Code of Military Justice, 10 USC §§ 881, 920, and 934, respectively. Upon arraignment, both men entered pleas of not guilty. Each was acquitted of rape, but the court-martial found them guilty of attempted rape, contrary to Article 80 of the Uniform Code, 10 USC § 880, and likewise convicted them of the other two charges upon which they were brought to trial. Both received identical sentences to dishonorable discharge, confinement at hard labor for three years, forfeiture of all pay and allowances for a like period, and reduction to the grade of airman recruit.

Thereafter, the findings and sentences adjudged by the trial court were approved by the officer exercising general court-martial jurisdiction. The board of review, however, set aside the findings of guilty of attempted rape and conspiracy as to both accused. It approved a modified finding of lewd and lascivious conduct as to each and reassessed the punishment, reducing the sentences of the pair to bad-conduct discharge, confinement at hard labor for five months, total forfeitures, and reduction. The case is before this Court on the following questions certified to us by the Acting The Judge Advocate General of the Navy in accordance with Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867:

"I. Was the Board of Review correct in setting aside, with respect to both accused, the findings of guilty of Charge I, attempted rape?

"II. Was the Board of Review correct in setting aside, with respect to

**279**

both accused, the findings of guilty of the Additional Charge, conspiracy to commit rape?"

The evidence adduced at the trial presents a sordid and revolting picture which need not be discussed in detail other than as necessary to decide the certified issues. In brief, both these young accused—Thomas being twenty years of age, and McClellan only nineteen, at the time of the instant offenses—started their fateful evening on a "bar hopping" spree. They were accompanied by an eighteen-year-old companion, Abruzzese, who, like both accused, held the grade of airman in the Navy. The latter was a co-actor in these offenses, but was granted immunity from prosecution for his criminality in the incidents, and testified as a witness for the Government.

After several stops the trio entered a tavern known as "Taylor's Place" where McClellan began dancing with a girl. Almost at once she collapsed in McClellan's arms. Thereafter, he, with his two companions, volunteered to take her home. They placed the apparently unconscious female in McClellan's car and left. Abruzzese was seated beside McClellan, who drove; Thomas was in the left rear seat next to the girl. Before they had proceeded very far McClellan, in frank, expressive language, suggested that this was a good chance for sexual intercourse as apparently this woman was just drunk and would never know the difference. Each of the three subsequently did or attempted to consummate this act and then started their return to town. The three became concerned as the woman had not regained consciousness.

In the meantime they dropped Abruzzese off at the USO. The accused, unable to find the female's home and becoming more concerned about her condition, stopped at a service station seeking help. The attendant called the police who, upon arriving at the service station, examined the girl and determined she was dead. An ambulance was called and she was taken to a hospital for further examination. An autopsy, later performed, revealed that she apparently died of "acute inter-

**280**

stitial myocarditis." In general terms this is a weakening of the heart muscles with edema and inflammation which occurs more in young people without its presence being suspected. It was the general undisputed opinion that her death probably occurred at the time she collapsed on the dance floor at Taylor's Place or very shortly thereafter. Apparently, in deaths of this type, rigor mortis does not usually begin for some time and as a result the accused were unaware of the fact she was dead.

The chief witness for the prosecution was the co-actor Abruzzese who, as we have noted, had been granted immunity. He implicated himself and both accused in his testimony. A written statement by McClellan concerning the alleged offenses was introduced through an agent of the Office of Naval Intelligence, a witness for the prosecution. The accused Thomas discussed the alleged incident with this same Office of Naval Intelligence agent, but no statement by Thomas was introduced into evidence. Numerous other witnesses testified, including medical experts, and the record of trial and exhibits in this case are voluminous. However, as the board of review stated, no factual dispute exists as to the death of the female involved and the cause thereof. It is clear, as that appellate body concluded, the victim was dead at the time she was removed from the tavern or relatively shortly thereafter, and the prosecution adduced no convincing evidence that she was alive at the time the offenses were committed. Indeed, on the merits trial counsel argued there could be no question but that the accused were guilty of attempted rape, "because the evidence shows that they would be guilty of rape if it wasn't for the fact that the government failed in its proof, perhaps, that she was alive at the time of the intercourse." Neither—at least as we need be concerned, since we deal here only with convictions for conspiracy and attempt, and not with the substantive offense of rape itself—can there be any real controversy regarding the acts done by Abruzzese and the two accused.

Despite the fact that defense counsel at trial vigorously urged to the law

officer that the offenses of attempt and conspiracy could not be found validly if the victim's death occurred prior to the commission of the alleged acts, the law officer ruled otherwise. He instructed the court that to find the accused guilty of rape, or of assault, assault and battery, assault with intent to commit rape, or indecent assault as lesser included offenses thereto, it must be shown beyond a reasonable doubt that the victim was alive at the time of the alleged acts. Otherwise, he admonished the court members, the accused must be acquitted of those offenses. The law officer then continued, and instructed the court on the elements of attempt as an included lesser crime to rape. However, unlike the instructions given as to rape and the other lesser offenses previously mentioned, the law officer did not instruct that being alive was essential to a finding of attempt. That clearly drawn distinction is illuminated by the following colloquy which subsequently ensued between a member of the court and the law officer:

"Cdr. Carpenter: I don't remember you pointing this out in your instructions—you said the woman must be alive if raped but you didn't say whether she had to be alive for attempted rape, although I think you implied it.

"LO: Yes, sir. There is no requirement under the instructions which I have given you that there be a finding she be alive before the accused may be convicted of attempted rape. However, before you can make a finding of guilty of rape or the other lesser included offenses, not including attempted rape, you must so find as a matter of fact that she was alive at that time."

Likewise, the court-martial was not required to find that the alleged victim was alive in order to find the accused guilty of conspiracy.

Before the board of review, appellate defense counsel contended that the law officer erred in his instructions to the court on the attempt and conspiracy offenses. In support of that position, the defense argued that where circumstances beyond the accused's control make it legally impossible to commit a crime, as distinguished from factual impossibility to do so, there can be no attempt nor can there be a conspiracy to commit the substantive offense.

In substance, then, the question thus presented to the board of review was, whether the law officer was correct in his instructions to the court-martial that a finding the victim was alive was not essential to a conviction for attempt as a lesser included offense of rape. As noted above, the law officer had replied to the question of a court member that there was no requirement under the instructions given that there be a finding that she be alive before the accused could be convicted of attempted rape.

The board faced up squarely to the issue, stating:

"Factually, the evidence adduced clearly indicates an attempt made by the accused to effect sexual relations with the victim without her consent. Whether the act was ever consummated is a matter of conjecture. However, the question the board must resolve goes to the legal possibility of such offense as attempt to rape being committed upon a woman, whom the evidence strongly and clearly indicates, was not alive at the time of the attempt."

The board of review held that an attempt to commit a crime must be directed to an object on which it is possible to commit the crime. Reasoning that a corpse is not a person, the board of review determined that the law officer erred in his instruction that there was no requirement that the victim be alive before the accused could be convicted of attempted rape. Thus, the board stated, "If the consummation was not an offense, the attempt herein was not an offense," and concluded, "Legally under the facts and law before us the offense of rape and the lesser included offenses including attempts were impossible of commission." Similarly, it was found that the accused could not be found guilty of conspiring to do that which if effected or consummated would not be an offense. Accordingly, the

281

board of review set aside both accused's convictions for attempt to commit rape and for conspiracy to commit rape.

It is this action of the board which gives rise to the certified questions.

The rules of law applying to attempts and those applying to conspiracies are very closely related. Our principal discussion shall be confined to attempts. However, we shall, in essence, treat of the two certified issues together.

After exhaustive reading in the area of criminal attempts as they have been treated in the civilian courts, we appreciate the validity of the total frustration evidenced by the following quotations:

". . . It has been truly said by a philosophical writer that 'the subject of criminal attempt, though it presses itself upon the attention wherever we walk through the fields of the criminal law, is very obscure in the books, and apparently not well understood either by the textwriters or the Judges.' And it may be added that it is more intricate and difficult of comprehension than any other branch of the criminal law. Each case must therefore be determined upon its own facts, in the light of certain principles which appear to be well settled. The difficulty generally is in determining the proximity of the act in question to the offense in contemplation." [Hicks v Commonwealth, 86 Va 223, 9 SE 1024 (1889).]

". . . It is useless to undertake to reconcile the authorities on the subject of what constitutes an attempt, or what is an overt act, within the meaning of the section in question. It is equally impossible for us to undertake to lay down any rule on this subject which would serve as a guide in all future cases. To a very great extent each and every case must stand on its own facts. The text-books and decisions are noted for their lack of harmony. It is impossible to decide any case on this subject without doing violence to some authority or some adjudicated case." [Stokes v State, 92 Miss 415, 46 So 627 (1908).]

See also 1 Bishop, A Treatise on Criminal Law, 9th ed, § 725, at page 517, where it was said as to attempts:

"The subject of this chapter is alike intricate and important. The reports are full of cases upon it, yet it is but imperfectly understood by the courts."

In all candor we must confess that we claim no particular expertise as to the question of attempts as they have troubled our brothers on the bench of tribunals in the civilian community. We profess no mastery of the subject and do not purport to be more competent than other judges to resolve the conflicts in the civilian authorities which trouble them. However, as shall later be developed, we do not consider it necessary to evaluate the civilian decisions ourselves, nor to take a stand with or opposed to any one or group thereof. Nevertheless, as a backdrop against which to consider the problem, we deem it appropriate to explore the intricacies of the civilian holdings in the area.

As might be anticipated, a subject so intriguing has frequently received the attention of legal scholars as reflected by numerous articles and papers appearing in law school publications. Among others we have read the following with interest and profit:

"Contemporary Problems of Criminal Attempts" by Paul Kichyun Ryu, Professor of Law, Seoul National University in Korea, 32 New York University Law Review, page 1170 (1957).

"The Effect of Impossibility on Criminal Attempts" by John S. Strahorn, Jr., 78 University of Pennsylvania Law Review, page 962 (1930).

"Criminal Attempts—The Rise and Fall of an Abstraction" by Honorable Thurman W. Arnold, Dean of University of West Virginia Law School and visiting Professor of Law at Yale (later Associate Justice, United States Court of Appeals for the District of Columbia), 40 Yale Law Journal, page 53 (1930).

"Criminal Attempts" by Francis Bowes Sayre, Professor of Law, Har-

vard Law School, 41 Harvard Law Review, page 821 (1928).

"Criminal and Non-Criminal Attempts" by John W. Curran, Professor of Law, DePaul College of Law, 19 Georgetown Law Journal, Part I, page 185; Part II, page 316 (1931).

"Criminal Attempts at Common Law" by Edwin R. Keedy, Professor of Law Emeritus, University of Pennsylvania, 102 University of Pennsylvania Law Review, page 464 (1954).

Text writers have covered the subject extensively, and we refer the interested reader to the following:

1 Bishop, A Treatise on Criminal Law, supra, §§ 411, 729, 736, 742, 745, and 747.

1 Burdick, The Law of Crime, § 143 (1946).

Williams, Criminal Law, 2d ed, § 11, page 17; § 205 et seq, page 633.

Perkins, Criminal Law, pages 486, 488, and 494 (1957).

1 Wharton, Criminal Law and Procedure, §§ 71 and 78 (1957).

In practically all of the foregoing articles and texts, the specific question involved in this case—im- ■■■■■■ possibility of completion of the substantive crime— is discussed at very considerable length. The two reasons for "impossibility" are treated in this connection: (1) If the intended act is not criminal, there can be no criminal liability for an attempt to commit the act. This is sometimes described as a "legal impossibility." (2) If the intended substantive crime is impossible of accomplishment because of some physical impossibility unknown to the accused, the elements of a criminal attempt are present. This is sometimes described as "impossibility in fact."

The authorities seem to be in fair accord that (1), above, is not punishable as an attempt. There is some considerable conflict of authority as to whether (2), above, is punishable as an attempt, but the preponderance seems to be that such instances do constitute attempts. What is abundantly clear, however, is that it is most difficult to classify any particular state of facts as positively coming within one of these categories to the exclusion of the other.

Practically all writers on this subject, whether in law journal articles, texts, or judicial opinions, cite and discuss the same relatively limited number of decisions. These decisions are generally placed in the two following categories:[1]

1. "Legal impossibility" in which attempt convictions have been set aside on the ground that it was legally impossible for the accused to have committed the crime contemplated. These are as follows:

(a) A person accepting goods which he believed to have been stolen, but which were not then "stolen" goods, was not guilty of an attempt to receive stolen goods. People v Jaffe, 185 NY 497, 78 NE 169 (1906).

(b) An accused who offered a bribe to a person believed to be a juror, but who was not a juror, could not be said to have attempted to bribe a juror. State v Taylor, 345 Mo 325, 133 SW2d 336 (1939).

(c) An official who contracted a debt which was unauthorized and a nullity, but which he believed to be valid, could not be convicted of an attempt to illegally contract a valid debt. Marley v State, 58 NJL 207, 33 Atl 208 (1895).

(d) A hunter who shot a stuffed deer believing it to be alive had not attempted to take a deer out of season. State v Guffey, 262 SW2d 152 (Mo) (1953).

(e) It is not an attempt to commit subornation of perjury where the false testimony solicited, if

[1] In this connection, the attention of the interested reader is invited to Tentative Draft No. 10, Model Penal Code of the American Law Institute, May 6, 1960, page 30, et seq.

given, would have been immaterial to the case at hand and hence not perjurious. People v Teal, 196 NY 372, 89 NE 1086 (1909).

2. Instances in which a claim of impossibility has been rejected and convictions sustained, are included below. Apparently these can all be classified as "impossibility in fact." These decisions are:

(a) It is now uniformly held that one is guilty if he attempts to steal from an empty pocket. Commonwealth v McDonald, 5 Cushing 365 (Mass) (1850). People v Jones, 46 Mich 441, 9 NW 486 (1881). People v Moran, 123 NY 254, 25 NE 412 (1890). People v Fiegelman, 33 Cal App 2d 100, 91 P2d 156 (1937). The same is true as to an empty receptacle, Clark v State, 86 Tenn 511, 8 SW 145 (1888); and an empty house, State v Utley, 82 NC 556 (1880). The rule is applied whether the attempt is to commit burglary, State v McCarthy, 115 Kan 583, 224 Pac 44 (1924); People v Dogoda, 9 Ill 2d 198, 137 NE2d 386 (1956); robbery, Commonwealth v Crow, 303 Pa 91, 154 Atl 283 (1931); State v Scarlett, 291 SW2d 138 (Mo) (1956); extortion, People v Fratiano, 132 Cal App 2d 610, 282 P2d 1002 (1955); or obtaining by false pretenses, People v Arberry, 13 Cal App 749, 114 Pac 411 (1910).

(b) One can attempt to possess narcotics, even though accused obtained possession of talcum believing it to be narcotics. People v Siu, 126 Cal App 2d 41, 271 P2d 575 (1954). And, one can be convicted of attempted use of a narcotic drug even though there is a reasonable doubt as to whether the substance was a narcotic. United States v Dominguez, 7 USCMA 485, 22 CMR 275.

(c) An accused may be guilty of attempted murder who, suspecting that a policeman on the roof was spying upon him through a hole, but ignorant that the policeman was then upon another part of the roof, fired at the hole with intent to kill. People v Lee Kong, 95 Cal 666, 30 Pac 800 (1892). It is attempted murder to shoot into the intended victim's bed believing he is there asleep when in fact he is some place else. United States v Cruz-Gerena, CM 228955, 49 BR 245 (1943); State v Mitchell, 173 Mo 633, 71 SW 175 (1902). An accused is not absolved from the charge of attempted murder when he points an unloaded gun at his wife's head and pulls the trigger, if he actually thought at the time that it was loaded. State v Damms, 9 Wis 2d 183, 100 NW2d 592 (1960).

(d) In attempted abortion cases an accused may be guilty in the absence of proof that the woman was pregnant. Commonwealth v Tibbetts, 157 Mass 519, 32 NE 910 (1893); People v Huff, 339 Ill 328, 171 NE 261 (1930); United States v Woodard, 17 CMR 813 (1954). Where the statute refers to "any woman," it is immaterial whether she was pregnant or not if the defendant believed she was. Peckham v United States, 226 F2d 34 (CA DC Cir) (1955).

It must be noted, however, that efforts to arrange these various authorities into some sort of classification have met with little real or satisfactory success. For instance, in 78 Pennsylvania Law Review, supra, at pages 962–63, and 997, we read:

"Three kinds of impossibility have always been distinguished. The first is an *intrinsic* impossibility, arising when the means used by the actor are ineffectual in themselves. . . . [shooting with defective gun]. The second kind is an *extrinsic* impossibility. . . . [shooting at a log believing it to be a person]. The third kind is a *legal* impossibility arising because of the noncriminality of the result desired by the actor. . . . [attempted rape by one too young to be convicted of rape].

*     *     *     *     *

"Intrinsic impossibility excuses only when it prevents a *substantial* impairment of interest, extrinsic

when it prevents *any* impairment and legal when it negatives the *existence* of the interest set up."

That writer noted, at page 963, that these distinctions were unworkable:

"This tri-partite division of impossibility into intrinsic, extrinsic, and legal, while covering the field entirely, is more a theoretical than a practical one."

These categories and classifications have been further criticized. Among others, are the following:

". . . There are no degrees of impossibility and no sound basis for distinguishing among the conditions necessary for commission of the intended harm." [Hall, General Principles of Criminal Law, 2d ed, page 589 (1960).]

"The distinctions . . . are ingenious, but . . . they lead us either to absurd results or else to no results. . . ." [40 Yale Law Journal, supra, at page 71.]

So, too, Professor Sayre indicates that regardless of artificial classifications, one stabbing a corpse thinking it a live person should be liable for attempted murder. Thus he states in a footnote, at 41 Harvard Law Review, supra, page 853:

". . . [W]here one comes upon his enemy lying apparently asleep and stabs him to the heart, and it is later shown that the victim was dead before the defendant stabbed him, although the defendant could not of course be convicted for murder, he should be held liable for an attempt to kill if his belief that the victim was still living was under all the circumstances a natural and reasonable one."

The lack of logic between some of the holdings, supra; the inherent difficulty in assigning a given set of facts to a proper classification; the criticism of existing positions in this area; and, most importantly, the denial of true and substantial justice by these artificial holdings have led, quite naturally, to proposals for reform in the civilian legal concepts of criminal attempts.

In addition to a progressive and modern view now evident in some judicial decisions and writings, The American Law Institute in its proposal of a "Model Penal Code" defines Criminal Attempts, in Article 5.01, as follows:

"(1) *Definition of attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result, without further conduct on his part; or

(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime."

The import of that suggested statute is made clear in Tentative Draft No. 10 of the Model Penal Code of The American Law Institute, supra, at page 25, where it is stated:

". . . It should suffice, therefore, to indicate at this stage what we deem to be the major results of the draft. They are:

(a) to extend the criminality of attempts by sweeping aside the defense of impossibility (including the distinction between so-called factual and legal impossibility) and by drawing the line between attempt and non-criminal preparation further away from the final act; the crime becomes essentially one of criminal purpose implemented by an overt act strongly corroborative of such purpose; . . ."

After having given this entire question a great deal more than casual attention and study, we are forced to the conclusion that the law of attempts in

military jurisprudence has tended toward the advanced and modern position, which position will be achieved for civilian jurisprudence if The American Law Institute is completely successful in its advocacy of this portion of the Model Penal Code.

Because of the legal acumen of the law officer of this general court-martial, the trial was conducted in accordance with this approach. We ■■■■■■ ■ conclude that his instructions to the court-martial with reference to the offense of rape, the lesser included offenses thereto, including attempt to rape, and conspiracy, furnished correct advice on impossibility insofar as the same is affected by the death of the victim.

In its effort to follow civilian authorities into the intricacies and artificial distinctions they draw in the field of criminal attempts, however, the board of review fell into error. And, it is error of serious proportions which, if affirmed, would lead military jurisprudence into the morass of confusion as to criminal attempts in which civilian jurisprudence finds itself immobilized, and from which heroic efforts are being made to extricate it. We have been unable to find, nor has there been called to our attention, any instance where the issue of impossibility, factual or legal, has been an impediment to conviction of criminal attempt in the military system. The adoption of Article 80, Uniform Code of Military Justice, supra, has served to make this abundantly clear and to give it the permanency of statutory law.

Prior to the adoption of the Uniform Code of Military Justice, there was neither an Article of War nor an Article for the Government of the Navy specifically defining attempts under a separate punitive article. See Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H. R. 2498, page 1224. Attempts were then tried under the general articles, except in those instances in which attempts to commit certain offenses were specifically provided in the Article proscribing the substantive offense itself. Under the Code today there are still isolated instances where an attempt is proscribed together with the substantive offense itself.[2] However, attempts in general are now proscribed under a separate punitive article.[3] See also paragraph 159, Manual for Courts-Martial, United States, 1951.

That statute, Article 80 of the Code, supra, defines attempts as follows:

"(a) An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its commission, is an attempt to commit that offense."

The language seems clear. The elements of the offense denounced are: (1) an overt act, (2) specific ■■■■■■ ■ intent, (3) more than mere preparation, (4) tending to effect the commission of the offense, and (5) failure to effect its commission.[4]

There are no other elements to the offense. Boards of review and this Court possess no warrant to limit the language chosen by the Congress in the definition. The language is clear and unambiguous and is to be applied not interpreted. United States v Davis, 12 USCMA 576, 578, 31 CMR 162.

In addition to the plain language of Article 80, the history of the adoption of the Uniform Code of Military Justice and the legislative history of this Article clearly sustain the position we take herein. As many opinions of this Court have pointed out, the Uniform.

---

[2] See, for example, Articles 100, 104, and 128, Uniform Code of Military Justice, 10 USC §§ 900, 904, and 928. See also Articles 85 and 94 of the Code, 10 USC §§ 885 and 894.

[3] See the recent decision of this Court in United States v Marsh, 13 USCMA 252, 32 CMR 252, where we treated with a similar instance as to accessory after the fact.

[4] It should be noted that Article 80 (c), Uniform Code of Military Justice, supra, authorizes conviction under a charge and specification alleging an attempt, even though the substantive offense is consummated.

Code was adopted by Congress only after thorough and detailed study and consideration by the cognizant committees of both Houses of the Congress, assisted by a special committee of legal scholars designated by the Secretary of Defense to study military justice and its administration. On prior occasions and in different settings this Court has referred to and quoted at considerable length from the testimony before the committees of the Congress indicating the thorough and detailed knowledge possessed by the members of that special committee. It would be the height of folly on our part to conclude that such a committee, or the Congress, decided to include a specific article on attempts for the purpose of adopting a civilian doctrine which has been shown to be a source of utter frustration for the courts, text writers and law professors. Certainly Article 80 does not represent an intent to bring into the body of military jurisprudence a provision "more intricate and difficult of comprehension than any other branch of the criminal law"; nor to adopt a rule of decision under which it would be "impossible to decide any case on this subject without doing violence to some authority or some adjudicated case." We must reject the possibility of adopting for the military an antiquated and discredited rule involving such nebulous distinctions as "factual and legal impossibility." Nor can we espouse formulae for the solution of this question which have been universally condemned as unsound, unworkable, absurd, or nonsense.

A comparison of the Manual for Courts-Martial, U. S. Army, 1949, with the Manual for Courts-Martial, United States, 1951, indicates that the drafters of the Manual understood exactly what Congress had accomplished by the adoption of Article 80, supra. Paragraph 183c of the 1949 Manual[5] includes the following on the subject of attempts, then cognizable under the general article, Article of War 96:

"An attempt to commit a crime is an act done with intent to commit that particular crime, and forming part of a series of acts which will apparently, if not interrupted by circumstances independent of the will of the actor, result in its actual commission.

"An intent to commit a crime not accompanied by an overt act to carry out the intent does not constitute an attempt. For example, a purchase of matches with intent to burn a haystack is not an attempt. But it is an attempt when the haystack is actually set on fire, even though it may be immediately put out by rain, blown out by the wind, or otherwise extinguished, with only immaterial damage to the hay. It is not an attempt when every act intended by the accused could be completed without committing a crime, even though the accused may at the time believe he is committing a crime. Thus, to shoot at a log believing it to be a man would not be an attempt to murder.

"Soliciting another to commit a crime is not an attempt, nor is mere preparation to do a criminal act."

The present Manual, however, is very materially different. It sets forth the provisions of Article 80, substitutes the defective gun and empty pocket examples for the shooting at a log illustration used in previous Manuals, and makes material and most significant additions which will be discussed hereinafter. Paragraph 159, Manual for Courts-Martial, 1951, supra, reads:

"An attempt to commit an offense is an act or acts done with the specific intent to commit the particular offense which, except for the interference of some cause preventing the carrying out of the intent, apparently would result in the actual commission of the offense.

"To constitute an attempt there must be a specific intent to commit the particular offense accompanied by an overt act which directly tends to accomplish the unlawful purpose.

[5] The Manual for Courts-Martial, U. S. Army, 1928, in referring to attempts, was practically identical, there being only unimportant changes in verbiage.

The overt act must be more than mere preparation to commit the offense. Preparation consists in devising or arranging the means or measures necessary for the commission of the offense. The overt act required goes beyond preparatory steps and is a direct movement towards the commission of the offense. However, the overt act need not be the last proximate act to the consummation of the offense attempted to be perpetrated. For example, a purchase of matches with the intent to burn a haystack is not an attempt to commit arson, but it is an attempt to commit arson to apply a burning match to a haystack, even though the match may be immediately put out by the rain, blown out by the wind, or otherwise extinguished.

"It is not an attempt when every act intended by the accused could be completed without committing an offense, even though the accused may at the time believe he is committing an offense. But an accused may be guilty of an attempt, even though the crime turns out to be impossible of commission because of an outside intervening circumstance or because the accused miscalculated his opportunity to commit the offense intended. For example, if A without justification or excuse, levels a gun at B with intent to kill B, and pulls the trigger, A is guilty of attempt to murder, even though, unknown to A, the gun is defective and will not fire. A pickpocket who puts his hand in the pocket of another with intent to steal his purse is guilty of an attempt to steal, even though the pocket is empty."

In addition to the substitution of examples, to which we have adverted, the following language appears in a Manual for the first time:

". . . But an accused may be guilty of an attempt, even though the crime turns out to be *impossible of commission* because of an outside intervening circumstance or because the accused miscalculated his opportunity to commit the offense intended." [Emphasis supplied.]

It must be noted as a matter of the most significant importance that the 1951 Manual completely changes the first paragraph of the discussion as the same appeared in prior Manuals. Eliminated are the portions requiring a series of acts and mention of interruption "by circumstances independent of the will of the actor." Therefore, the 1951 Manual is in accord with Article 80, supra, and our analysis, previously set forth herein, of the elements of the crime denounced thereby.

Providing illumination for our viewpoint and further explaining the Manual provisions is the following quoted from the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, pages 248–249:

"*Attempts.*—While Article 80 provides for the specific substantive offense of an 'attempt,' certain exceptions to charging an attempt as a violation of this article are found in Articles 85, 94, 100, 104, and 128 (that is, Desertion, Mutiny or Sedition, Subordinate compelling surrender, Aiding the enemy, and Assault). These articles specifically include the offense of an attempt to commit the principal offenses which they denounce. The provision of Article 80 that 'Any person subject to this code may be convicted of an attempt to commit an offense although it appears on the trial that the offense was consummated' is in accord with the judicial decisions of the Army and the Air Force, but is different from naval practice which has been that 'one proven actually to have committed an offense cannot be found guilty of an attempt to do so' (Sec. 43 NC&B). Subject to this exception the provisions of this article conform to the concepts of this offense which are presently held by the armed forces and expressed in their judicial decisions. Accordingly an accused is guilty of an attempt under the Uniform Code if he has committed acts requisite to constitute an attempt even though of his own accord he desisted before the consummation of the intended offense. (See F. B. Sayre, Criminal Attempts, (1927–

28) 41 Harvard Law Review 821, 847.) It should be noted that soliciting another to commit an offense does not constitute an attempt."

Note should be taken of the statement that the article's provisions "conform to the concepts of this offense which are presently held by the armed forces and expressed in their judicial decisions." Our attention has been called to no armed force judicial decision, in existence prior to the Uniform Code of Military Justice, holding that impossibility, either factual or legal, will vitiate a conviction of criminal attempt. On the contrary, we note that in United States v Cruz-Gerena, CM 228955, 49 BR 245 (1943), the accused was charged with an attempt to murder a sergeant of his organization. He visited the tent where the sergeant customarily slept and learned the exact location of the sergeant's cot. After midnight the accused went to the tent and fired six or seven shots through the tent flap and into the sergeant's cot. Neither the sergeant nor anyone else was in the tent at the time. A board of review in the office of The Judge Advocate General of the Army cited a number of the cases and authorities to which we have referred in this opinion, including 78 University of Pennsylvania Law Review, supra; People v Lee Kong, 95 Cal 666, 30 Pac 800 (1892) ; and State v Mitchell, 173 Mo 633, 71 SW 175 (1902), and affirmed the conviction of attempted murder. Of course, that 1943 decision of the board of review was prior to the adoption of the Uniform Code of Military Justice.

The Legal and Legislative Basis, supra, refers to the article by Professor Francis Bowes Sayre in 41 Harvard Law Review, which we have mentioned earlier. This is a learned discourse on the subject of criminal attempts and its inclusion in the Legal and Legislative Basis is significant. Of all the law journal articles we have cited, Professor Sayre's article seems strongest on the elimination of impossibility as a bar to prosecutions for attempts. We have previously noted herein Sayre's statement that one who stabs a corpse thinking it a live person should be liable for attempted murder. In addition, the conclusions he sets forth in his summary comport with the requirements of Article 80 and the law of criminal attempts as known to military jurisprudence. We quote from his summary as follows:

"(4) There can be no criminal liability for an attempt without proof of a specific intent to effect the particular criminal consequence which constitutes the crime attempted. In other words, at least one of the defendant's objectives (of which there may be several) must constitute (whether the defendant knows the law or not) the crime attempted.

"(5) For convenience of discussion three important groups of attempt cases may be separately considered, i.e.,

I. Where the consummation of the crime was prevented by the interruption of the defendant from completing all his intended acts, or by his voluntary withdrawal;

II. Where the consummation of the crime was prevented after the completion of the defendant's intended acts by the interposition or operation of extraneous forces unexpected by the defendant;

III. Where the consummation of the crime was prevented by some mistake of fact on the part of the defendant.

"(6) In cases falling within the first of these groups, the defendant's criminality will depend upon whether or not his conduct has passed beyond mere preparation into the field of indictable attempts; and this in turn will depend upon the gravity of the crime and the danger to be apprehended from the defendant's conduct.

"(7) In cases falling within the second group, the defendant may usually be convicted.

"(8) In cases falling within the third group, the defendant may usually be convicted if a reasonable man in the same circumstances as the defendant might expect the intended criminal consequence to result from the defendant's acts.

"(9) *The physical impossibility of accomplishing the crime will not be a bar to conviction.*

. . . . .

"(11) The crime of solicitation should be kept distinct from that of attempt." [Emphasis supplied.] [41 Harvard Law Review at pages 858–59.]

The provisions of Article 80; the language of the current Manual for Courts-Martial; the discussion from the Legal and Legislative Basis; and Professor Sayre's article and conclusions, when read together, impart a logical whole to the questions involved in the revolting facts of the transgression here before us, and bring this case within the proper legal construction of criminal attempts as the same are punishable under the Uniform Code of Military Justice.

Since the adoption of the Code, both boards of review and this Court have construed Article 80 in accordance with the conclusions we reach herein. In United States v Woodard, 17 CMR 813, a board of review wrote an exhaustive opinion on attempts. We have read the opinion of the board, dealing with abortion and the lesser included offense of attempted abortion, with considerable care. We find it to contain a clear and legally correct exposition of attempts as they exist in military law. In that case the board of review posed the question:

". . . Does the utter impossibility of the commission of the major offense charged vitiate any criminality in an attempt to commit it?" [At page 830.]

The board analyzed paragraph 159, Manual for Courts-Martial, United States, 1951, supra, and the decision in United States v Cruz-Gerena, supra, at considerable length and then answered the question as follows:

". . . Viewed in the light of the rationale advanced in the *Cruz-Gerena case* the actual impossibility of completing a full miscarriage because of non-pregnancy does not prevent an attempt to cause such a miscarriage from possessing criminality.

This is necessarily so because of the public's right to protect the female's person, which is implicit within the basic proscription against abortion, and morals, decency and hygienic standards have been infringed by the attempt to commit it. . . ." [17 CMR at pages 831–32.]

We endorse the foregoing language of the board of review as a correct statement of the law.

This Court, in construing Article 80 in another instance, came to conclusions which we regard as dispositive of the issues in this case. In United States v Dominguez, 7 USCMA 485, 22 CMR 275, the accused was convicted by general court-martial for attempted use of a narcotic drug. Before this Court the following instruction, given by the law officer to the court-martial, was assigned as error:

" '. . . if you are satisfied beyond a reasonable doubt that the accused at the time and place alleged intended to use a habit forming narcotic drug and did in fact use a substance which he intended and believed to be a habit forming narcotic drug, you may find him guilty of attempting wrongfully to use a habit forming narcotic drug even though you may not be satisfied beyond a reasonable doubt that the substance which he used was in fact a habit forming narcotic drug.' "

We cited with approval, in the course of our opinion in that case, 14 Am Jur, Criminal Law, § 69; and 22 CJS, Criminal Law, § 77, and unanimously overruled the assignment levelled at the foregoing instruction, stating:

"When the general rule is applied to the facts before us, it is at once apparent that the question of whether the accused attempted to use a narcotic drug does not at all depend upon the true nature of the substance which he used intravenously. It is clear that he intended to commit the crime of using a habit-forming drug, that he did an overt act toward its commission, that the crime was apparently possible of commission in that the substance used seemed apparently adaptable to that end, and

that the court-martial was entitled to have some doubts as to whether the white powder was a habit-forming narcotic drug." [7 USCMA at page 487.]

We hold, therefore, in accordance with the foregoing authorities, that in this instance the fact that the female, upon whom these detestable acts were performed, was already dead at the time of their commission, is no bar to conviction for attempted rape.

However, for purposes of clarity, we should make mention of that portion of paragraph 159, Manual for Courts-Martial, supra, which reads:

"It is not an attempt when every act intended by the accused could be completed without committing an offense, even though the accused may at the time believe he is committing an offense."

That provision has no reference to questions we have here discussed. Such language says no more than that if what an accused believed to be a substantive crime was actually no crime at all, he cannot be guilty of an attempt to commit such crime. That is, when the intended action, even if completed, is not an offense despite the fact accused believed otherwise, he cannot be held for a criminal attempt. Under those circumstances a substantive offense is nonexistent, and an accused's acts, whether carried to fruition or not, constitute wholly lawful conduct. It is interesting to observe that the same situation will exist under the Model Penal Code. See Tentative Draft No. 10, supra, page 31, which states, in the commentary:

"Of course, it is still necessary that the result desired or intended by the actor constitute a crime. If, according to his beliefs as to facts and legal relationships, the result desired or intended is not a crime, the actor will not be guilty of an attempt even though he firmly believes that his goal is criminal."

What we have said as to attempts applies in large measure to the charge and specification alleging conspiracy to commit rape. Under Article 81 of the Uniform Code, supra, a conspiracy consists of an agreement between two or more persons to commit an offense under the Code and the crime is complete if one or more of the conspirators does an overt act to effect the object of the conspiracy. All these phases of conspiracy are discussed fully in a recent opinion of this Court. See United States v Kidd, 13 USCMA 184, 32 CMR 184.

For the above stated reasons, we hold that the law officer did not err in the instructions given to the court-martial in connection with attempted rape and conspiracy to commit rape.

It is clear from this record, by the findings of the court-martial and the facts as sustained by the board of review, that each of these appellants was guilty of each element necessary to the crime of attempted rape. That is, each of the appellants did:

1. A certain overt act.

2. The act was done with the specific intent to commit the offense of rape; that is, each intended to have sexual intercourse with a female not his wife by force and without her consent.

3. The act amounted to more than mere preparation.

4. It apparently tended to effect the commission of the intended offense, even though

5. The intended offense failed of completion because, unknown to either appellant and as a matter beyond their control, their victim was already dead.

Likewise, all of the necessary elements of conspiracy to commit the offense of rape are present. That is:

1. Each of these accused and their co-actor Abruzzese mutually entered into an agreement to commit rape on the female alleged.

2. Thereafter, while the agreement continued in existence and while each of appellants remained a party thereto, each performed an overt act to effect the object of the agreement.

All the elements of both attempted rape and conspiracy to commit rape are present and were returned by the members of the court-martial under correct standards set out in the law officer's instructions. The board of review, therefore, erred in holding to the contrary.

The certified issues are answered in the negative, and the decision of the board of review is reversed. This case is returned to The Judge Advocate General of the Navy for action not inconsistent with this opinion.

Chief Judge QUINN concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

Professor Jerome Hall traces the difficulty in analyzing the defense of impossibility in criminal attempts to Baron Bramwell's original use of illustrative fact situations "from Never-Never Land" in Regina v Collins, 9 Cox CC 497, 169 Eng Rep 1477 (1864). Hall, General Principles of Criminal Law, 2d ed, page 593. I am inclined to attribute it to a growing tendency on the part of legal theoreticians to attach more importance to the evilness of a man's intent than to his acts—a belief, if you will, that the law should punish sinful thoughts if accompanied by any sort of antisocial conduct which evidences the design to execute forbidden acts. When certain courts adopt such broad penal theories and others reject them, the result is the legal morass to which my brothers refer.

The path which they have found out of this bog of theory, speculation, and learned dissertations is indeed tempting, for it eliminates any need to concern ourselves with the close and intricate question whether accused's actions fall within the area of legal impossibility. But I cannot in good conscience agree with a position which adopts a completely novel approach to the law of criminal attempts without the slightest indication that such was the intent of Congress in passing Uniform Code of Military Justice, Article 80, 10 USC § 880.

The mentioned statute provides pertinently:

"(a) An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its commission, is an attempt to commit that offense."

The sole Congressional reference to the foregoing Article indicates only that it was intended to provide specifically for that which "is now punished under the general articles" and, among other references, directs attention to sections 42 and 43 of Naval Courts and Boards, 1937. Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 1224.

The cited provisions of Naval Courts and Boards, supra, deal with the entire subject of attempts in just ten lines, none of which touch upon the doctrine of impossibility.

The legislative history of Code, supra, Article 80, is, therefore, devoid of any indication that Congress intended to change antecedent military law regarding legal impossibility. The principal opinion, however, rests its conclusion that such was the legislative plan upon the premise that the Article itself does not set forth legal possibility as an element of a criminal attempt and that the Manual for Courts-Martial, United States, 1951, evidences a violent change in the Congressional approach.

With all deference, I suggest that the failure of the Article to include legal possibility as an element is not material to our construction of the statute. One may scrutinize the punitive Articles of the Code from end to end without finding provisions therein which negate affirmative defenses. Thus, nowhere does the Code mention mental responsibility, honest and reasonable mistake of fact, partial mental responsibility, or, except in some isolated instances, knowledge. Yet, with respect to all crimes in the case of some of these defenses, and with respect to some offenses, in the case of the others, we have found no legislative intent to abolish them from the mere failure of Congress to include as an element, for example, that the accused be sane, or that he have knowledge of a

292

particular state of facts. See United States v Simmons, 1 USCMA 691, 5 CMR 119, and United States v Wallace, 2 USCMA 595, 10 CMR 93, especially concurring opinions of Judge Brosman.

In like manner, the Manual for Courts-Martial, United States, 1951, offers no basis for concluding that Code, supra, Article 80, was intended to adopt the approach of The American Law Institute and eliminate the defense of legal impossibility. In the first place, as has been quite clearly pointed out for a unanimous Court, the Manual, supra, is binding upon us only insofar as it purports to set out, not inconsistently with the Code, maximum limitations on punishments, rules of procedure, and principles of evidence. United States v Smith, 13 USCMA 105, 32 CMR 105. In matters of substantive law, it is we, rather than the President, who speak with authority. Yet, I find in the language used by the majority—perhaps unwittingly—an intimation that we are bound to accept what can purport to be no more than an executive construction of Code, supra, Article 80.

More importantly, I find nothing in the Manual's discussion of criminal attempts which indicates that it was believed that the defense of legal—as opposed to factual—impossibility was abolished upon enactment of the Uniform Code. Indeed, the Manual indicates precisely the contrary view, for it states:

"It is not an attempt when every act intended by the accused could be completed without committing an offense, even though the accused may at the time believe he is committing an offense. But an accused may be guilty of an attempt, even though the crime turns out to be impossible of commission because of an outside intervening circumstance or because the accused miscalculated his opportunity to commit the offense intended. For example, if A without justification or excuse, levels a gun at B with intent to kill B, and pulls the trigger, A is guilty of attempt to murder, even though, unknown to A, the gun is defective and will not fire. A pickpocket who puts his hand in the pocket of another with intent to steal his purse is guilty of an attempt to steal, even though the pocket is empty." [Emphasis supplied.] [Manual, supra, paragraph 159.]

The foregoing constitutes a classic statement of the defense of legal impossibility. As such, it is a recognition of antecedent military law and a continuation of the principles applicable to criminal attempts under the Articles of War. Thus, the Manual for Courts-Martial, U. S. Army, 1949, provided, in paragraph 183c:

". . . It is not an attempt when every act intended by the accused could be completed without committing a crime, even though the accused may at the time believe he is committing a crime. Thus, to shoot at a log believing it to be a man would not be an attempt to murder." [Emphasis supplied.]

The identical provision is found in the Manual for Courts-Martial, U. S. Army, 1928, at page 190. Cf. Manual for Courts-Martial, U. S. Army, 1921, § 417; Manual for Courts-Martial, U. S. Army, 1917, page 267; Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 383, 732.

As the current Manual, supra, expressly restates the applicability of the doctrine of legal impossibility in criminal attempts and thereby continues in effect the interpretation attributed by former texts to the Articles of War, I am at a loss to understand how it may be concluded that its drafters recognized a supposed Congressional design to eliminate this defense. True it is that the illustration of shooting at a stump is replaced by reference to examples of factual impossibility and that the discussion of attempts is extended considerably over the brief treatment formerly accorded them. No doubt such is due to the authors' recognition of the fact that military law was now to be administered primarily by lawyers who would have some grasp of the intricacies of the problem. To say, however, that the use of different hypotheses and the elimination of stump-shooting as an example suffices to over-

**293**

turn a well-recognized and important criminal defense expressly continued in the same paragraph is plainly specious.

Nor is it sufficient to dismiss the Manual's statement of the doctrine of legal impossibility with the observation that it means no more than, if accused's acts were completed, and such did not constitute *any* crime, he cannot be convicted of an attempt even if he subjectively, albeit erroneously, believed his acts constituted a crime. Such reasoning is casuistic in the extreme. At first blush, it seems to say that the crime being legally impossible, there can be no conviction of an attempt. That, of course, is in direct contradiction to the entire thrust of the principal opinion and, if I am correct in my belief, what my brothers are really saying is that, if accused's intended conduct is not an offense at all, he cannot be convicted of an attempt to commit a particular crime. So to pervert the plain meaning of the Manual's declaration, I suggest, is to do a grave injustice to its drafters and, at the same time, so to widen the scope of criminal attempts as to render their prosecution purely trials for the possession of criminal intent alone. Under such a rule, one who intended to commit any criminal offense at all might, if he did sufficient acts, be convicted of an attempt to commit an entirely unrelated offense. Thus, I suggest that the construction which the majority place on the Manual, supra, is unreal and that the reasoned interpretation of its provision is simply to continue the application of the defense of legal impossibility to Code, supra, Article 80.

I am reinforced in this conclusion by the construction of the statute before us by an Air Force board of review in United States v Woodard, 17 CMR 813, and our decision in United States v Dominguez, 7 USCMA 485, 22 CMR 275.

In the *Woodard* case, the board of review recognized the applicability of the doctrine of legal impossibility in military law, quoting with approval the statement from the Manual, supra, and referring to the earlier example of shooting at a log, believing it to be a man. United States v Woodard, supra, at page 830.

In United States v Dominguez, supra, at page 487, we unanimously concluded that one who injected a white powder in his own vein, believing such to be a habit-forming drug, was guilty of attempted use of narcotics quite without regard to the real nature of the substance. In so holding, we emphasized that the offense was apparently possible of consummation but recognized that one might not be convicted of an attempt to do an inherently impossible crime. Our language there constitutes a brief but clear exposition of the doctrine of legal as opposed to factual impossibility.

What the majority does, then, is not to interpret the statute before us but to legislate into existence the suggestion made by The American Law Institute in 1960 as a part of a Code enacted ten years before. It is difficult to concede to the Congress, wise as it may be, the clairvoyance implicit in such a construction of Code, supra, Article 80, when the problem went unmentioned in the hearings before the Armed Services Committees of both branches of the National legislature and in the debate before the House and Senate. So to adopt the solution proposed by scholars of the law to the cloudy questions for which they themselves are responsible is totally to abandon our role as judges and to succumb to the temptation to shape the statute in accordance with our own moral concepts rather than those of the people, as collectively expressed through their duly elected representatives.

That is precisely what is meant by justice under law rather than men, a fundamental principle of our system of government to which judges and attorneys frequently refer but too seldom adhere, preferring to substitute their wisdom for that of the legislature. For my part, absent a clear indication of Congress' intent to the contrary, I would leave to it the function of amendatory simplification.

Nor can I concede that judicial amendment is justified either on the basis of the difficulty of the question

294

before us or in order to save the military lawyer from dealing with the fine points of an intricate defense. Our task at best is no easy one, for Congress left many interstices of the Code to be filled by judicial interpretation. But we abandon our role as judges when we permit ourselves to be deterred from seeking wisdom among confusion on the pretext that the problem is too troublesome for understanding by either us or our bar. There are a vast number of conflicting decisions on every facet of the criminal law. It is our function to winnow out those which savor of sound and logical reasoning and to erect thereon our understanding of the law as Congress has enacted it. If the legislature disagrees, it may, as it has done in the past, quickly correct our views. But it is emphatically not our duty to supplant the legislature by doing that which we believe they should have done. And that is precisely what occurs when there is read into Code, supra, Article 80, the terms of a model enactment, proposing for the first time the abolition of a well-rooted principle of the law of attempts.

With all due deference, therefore, I cannot join my brothers in their conclusion that Congress intended to do away with the worrisome distinction between factual and legal impossibility when it enacted Code, supra, Article 80. Unlike United States v Marsh, 13 USCMA 252, 32 CMR 252, I can find no evidence of a legislative scheme to change a prior, well-established principle. To the contrary, every signpost on the path which the majority takes points in the direction opposite to that which they travel. I suggest, therefore, that it is necessary to meet the problem before us head on and to descend into the whirlpool of commentaries, articles, and opinions which surround the certificate.

As is pointed out in the principal opinion, the certified questions essentially inquire whether accused may be found guilty of attempted rape and conspiracy to commit rape when it appears that the "victim" was dead at the time of the offenses.

It should be noted at the outset that we are all in agreement that the offense of rape itself cannot be committed upon the body of a dead person. While cases directly involving a charge based upon such bizarre circumstances have not been found, such is the clear implication of Code, supra, Article 120, 10 USC § 920. See also Greenlee v State, 4 Tex App 345 (1878), and 75 CJS, Rape, § 38. The statute requires an act of sexual intercourse by the accused "with a female not his wife." A female is a living human being. 32 Words and Phrases, Person, page 309. And a "corpse is not a 'person.' That which constitutes a person is separated from the body by death." Brooks v Boston & N. St. Ry. Co. 211 Mass 277, 97 NE 760 (1912). Moreover, we have heretofore implied that the victim must be alive in order for the accused to be found guilty of rape. United States v Long, 2 USCMA 45, 48, 6 CMR 45, 48.

As it is, therefore, an utter impossibility for the consummated offense of rape to be committed upon the body of a dead person, may the accused who commits all the acts necessary to such offense upon a dead body, with the requisite *mens rea*, be convicted of an attempt to rape? The authorities in point have been cited at length in the principal opinion. In light of the conclusion which I reach, however, it is necessary to undertake a further discussion of underlying principles, their development, and their application to the facts with which we are confronted.

The development of attempts to commit crimes is a relatively recent innovation in the law. Its ancestor is apparently the decision of the King's Bench in Rex v Schofield, Cald 397 (1784). There, the defendant was indicted and tried for arson upon proof that he had placed a lighted candle among combustibles in a certain house, with intent to burn it. There was no proof of burning. The court held that the completion of an act, criminal in itself, when done with the necessary intent, was not required to constitute criminality. It pointedly inquired:

"... Is it no offence to set fire to a train of gunpowder with intent to burn a house, because by accident,

or the interposition of another, the mischief is prevented?" [Cald at page 400.]

The principle that attempts were indictable was restated and settled in Rex v Higgins, 2 East 5 (1801). See, generally, Sayre, "Criminal Attempts," 41 Harvard Law Review 821. Fifty-six years later, the question of impossibility was raised for the first time by Baron Bramwell's famous statement in Regina v McPherson, Dears & B 197 (1857), at page 201:

"... The argument that a man putting his hand into an empty pocket might be convicted of an attempt to steal, appeared to me at first plausible; but suppose a man, believing a block of wood to be a man who was his deadly enemy, struck it a blow intending to murder, could he be convicted of attempting to murder the man he took it to be?"

Subsequently, in Regina v Collins, supra, the English judges expressly held that attempted larceny was not made out by proof that the defendant pickpocket actually inserted his hand into the victim's empty pocket with intent to steal, Chief Justice Cockburn declaring, at page 499:

"We think that an attempt to commit a felony can only be made out when, if no interruption had taken place, the attempt could have been carried out successfully, and the felony completed of the attempt to commit which the party is charged."

This broad language, encompassing as it did both physical and legal impossibility, was later rejected by the English courts and the inability of the pickpocket to steal from an empty pocket held to be no defense to attempted larceny. Regina v Ring, 17 Cox CC 491, 66 LT (NS) 300 (1892). Such has been almost uniformly followed as the law in this country. See the cases collected in Sayre, *op cit*, page 855, footnote 113; cf. United States v Williams, 12 USCMA 683, 31 CMR 269.

Passing from the earlier English pronouncements concerning impossibility to modern decisions and commentaries, it appears almost universally true that physical or factual impossibility is not recognized as a defense to a charge of attempt, whereas legal impossibility is accorded such a status. The difficulty arises when various jurisdictions attempt to assign a particular factual situation to one or the other of these two categories.[1]

Impossibility cases have generally involved homicide, larceny and related crimes, rape, and what might be classified as a hodgepodge of statutory offenses, ranging from abortion to corruption of jurors.

The homicide cases have usually involved the absence of the victim. In State v Mitchell, 170 Mo 633, 71 SW 175 (1902), it was established that the defendant fired two shots into his intended victim's bedroom for the purpose of slaying him. The victim, however, was elsewhere in the house, and the attack went for nought. Rejecting the contention that accused should not have been convicted of attempted murder, the court stated, at page 177:

"... So in this case the intent evidenced by the firing into the bedroom with a deadly weapon, accompanied by a present capacity in defendant to murder Warren if he were in the room, and the failure to do so only because Warren happily retired upstairs instead of in the bed into which defendant fired, made out a perfect case of an attempt within the meaning of the statute. ..."

See also, to the same effect, United States v Cruz-Gerena, 49 BR 245.

In Stokes v State, 92 Miss 415, 46 So 627 (1908), the defendant hired an assassin, agreed to provide him with a loaded weapon, and accompanied him to

---

[1] Some writers state that legal impossibility is always a defense and physical impossibility *usually* is not. Close analysis of the problem will disclose that those cases in which "physical" impossibility has been held to be a defense are, in reality, cases of legal impossibility. Cf. Smith, "Two Problems in Criminal Attempts," 70 Harvard Law Review 422. It is suggested that this mislabeling has done much to add to confusion in the area.

a place of concealment from which the victim was to be ambushed. Defendant was arrested as he was handing the weapon to the assassin. The victim was not shown to be in the vicinity. In concluding that attempted murder had been made out, Judge Mayes declared, at page 629:

". . . All the authorities hold, that, in order to constitute an attempt, the act attempted must be a possibility; and counsel argue from this that the appellant could not have committed this crime at the time he was arrested, because Lane was not even there, and therefore, they say, no conviction could be had. It was no fault of Stokes that the crime was not committed. He had the gun, and the testimony warrants the conclusion that it had been taken for the purpose of killing Lane. It only became impossible by reason of the extraneous circumstance that Lane did not go that way, and, further, that he was arrested and prevented from so doing. This rule of the law has application only to a case where it is inherently impossible to commit the crime. It has no application to a case where it becomes impossible for the crime to be committed, either by outside interference or because of miscalculation as to a supposed opportunity to commit the crime which fails to materialize; in short, it has no application to the case when the impossibility grows out of extraneous facts not within the control of the party."

People v Lee Kong, 95 Cal 666, 30 Pac 800 (1892), involved a defendant who shot at a hole in the roof of his gambling establishment, intending to kill a policeman whom he supposed to be watching there. In fact, the policeman was on the roof but at another hole safely distant from the aperture at which defendant fired. The court said, at page 801:

"In this case the appellant had the present ability to inflict the injury. He knew the officer was upon the roof, and knowing that fact he fired through the roof with the full determination of killing him. The fact that he was mistaken in judgment as to the exact spot where his intended victim was located is immaterial. That the shot did not fulfill the mission intended was not attributable to forbearance or kindness of heart upon defendant's part; neither did the officer escape by reason of the fact of his being so far distant that the deadly missile could do him no harm. He was sufficiently near to be killed from a bullet from the pistol, and his antagonist fired with the intent of killing him. Appellant's mistake as to the policeman's exact location upon the roof affords no excuse for his act, and causes the act to be no less an assault."

In State v Damms, 9 Wis 2d 183, 100 NW2d 592 (1960), a different situation was presented. Accused, with intent to kill, held a pistol to his wife's head, and pulled the trigger twice. The weapon did not fire, as it did not contain any cartridges. The evidence indicated that accused in fact thought it was fully loaded.

Relying on a great number of decisions involving similar facts, the Wisconsin Supreme Court held that the defendant was properly convicted of attempted murder. It said, at page 596:

"Sound public policy would seem to support the majority view that impossibility not apparent to the actor should not absolve him from the offense of attempt to commit the crime he intended. An unequivocal act accompanied by intent should be sufficient to constitute a criminal attempt. Insofar as the actor knows, he has done everything necessary to insure the commission of the crime intended, and he should not escape punishment because of the fortuitous circumstance that by reason of some fact unknown to him it was impossible to effectuate the intended result."

See also State v Glover, 27 SC 602, 4 SE 564 (1888), wherein administration of an insufficient quantity of poison or even of a nonpoisonous substance to defendant's intended victim,

with intent to kill, was held to constitute assault with intent to commit murder. Cf. State v Clarissa, 11 Ala 57 (1847).

In People v Jaffe, 185 NY 497, 78 NE 169 (1906), it was concluded that the defendant could not be guilty of an attempt to receive stolen property when the cloth which he received was in fact not stolen. Cf. People v Gardner, 144 NY 119, 38 NE 1003 (1894). In the *Jaffe* case, the court noted, at page 169:

". . . In passing upon the question here presented for our determination, it is important to bear in mind precisely what it was that the defendant attempted to do. He simply made an effort to purchase certain specific pieces of cloth. He believed the cloth to be stolen property, but it was not such in fact. The purchase, therefore, if it had been completely effected, could not constitute the crime of receiving stolen property, knowing it to be stolen, since there could be no such thing as knowledge on the part of the defendant of a nonexistent fact, although there might be a belief on his part that the fact existed. As Mr. Bishop well says, it is a mere truism that there can be no receiving of stolen goods which have not been stolen. 2 Bishop's New Crim. Law, § 1140. It is equally difficult to perceive how there can be an attempt to receive stolen goods, knowing them to have been stolen, when they have not been stolen in fact.

"*The crucial distinction between the case before us and the pickpocket cases, and others involving the same principle, lies not in the possibility or impossibility* [factual?] *of the commission of the crime, but in the fact that, in the present case, the act, which it was doubtless the intent of the defendant to commit would not have been a crime if it had been consummated.*" [Emphasis supplied.]

Some jurisdictions have concluded that attempts to commit larceny by false pretenses occur where the victim knows the defendant's representations are false but parts with his money or

property without reliance thereon. Thus, in State v Peterson, 109 Wash 25, 186 Pac 264 (1919), the appellant called a department store and sought to obtain delivery of merchandise by falsely representing herself as another credit customer. The store was not deceived by her pretense and notified police officers. Appellant was apprehended when she called for the merchandise. In concluding that attempted larceny had been made out, the Washington Supreme Court stated, at page 265:

". . . Had the ruse succeeded in its entirety, there would have been a consummated offense, and it does not follow from the fact that the employés of the merchandise house were not deceived there is taken away from the transaction the element of attempt to deceive."

A like result was reached in Williams v State, 209 Miss 902, 48 So 2d 598 (1950), wherein the fraudulent representation was not acted upon at all by the intended victim. The court noted that the "only thing lacking in the consummation of the larceny was the actual delivery of the money." Williams v State, supra, at page 600. See also Commonwealth v Johnson, 312 Pa 140, 167 Atl 344 (1933).

In Marley v State, 58 NJL 207, 33 Atl 208 (1895), the defendants were indicted for incurring a debt on behalf of their county in excess of the limit permitted by law. It was shown in defense that the debt which the defendants contracted was void in law. In upsetting a conviction of attempt to incur a debt beyond the permissible limit, the court pointed out that, as the debt was a nullity from the standpoint of the body politic, it was legally impossible for it to have been incurred. Hence, the conviction of attempt would not lie. Marley v State, supra, at page 210. See also State v Weleck, 10 NJ 355, 91 A2d 751 (1952).

In like manner, it has been held that one does not commit the crime of attempted embracery when the individual whom he sought to corrupt was in fact not a juror, having been previously ex-

**298**

cused from attendance upon the trial. State v Taylor, 345 Mo 325, 133 SW2d 336 (1939); State v Porter, 125 Mont 503, 242 P2d 984 (1942). And where defendants intended to sell pears in violation of a pricing order and did in fact sell them, it was concluded that there could be no conviction of an attempt to violate the order upon a showing that the actual sale was within the order's terms. Rex v Dalton, 33 Crim App R 102 (1949). Nor could there be a conviction of an attempt to pursue and take a deer out of season upon proof that the defendant shot a stuffed deer. State v Guffey, 262 SW2d 152 (1953) (Missouri). In the last cited case, the court remarked, at page 156:

". . . The State's evidence shows that one of the defendants did shoot the dummy but did they pursue, chase or follow a *deer* by shooting this stuffed defunct doe hide? It was not a deer. If the dummy had been actually taken, (it could not be pursued) defendants would not have committed any offense. It is no offense to attempt to do that which is not illegal. See Burdick's Law of Crime, Vol. 1, Sec. 143, et seq. (1946). Neither is it a crime to attempt to do that which it is legally impossible to do. For instance, it is no crime to attempt to murder a corpse because it cannot be murdered. See State v Taylor, 345 Mo. 325, 133 SW 2d 336, loc. cit. 341."

On the other hand, it has been held possible to attempt to possess narcotics when the powder which defendant was furnished was in fact innocuous. People v Siu, 126 Cal App 2d 41, 271 P2d 575 (1954). Indeed, we have extended the same principle to a conclusion that it is equally proper to convict of attempted use of narcotics without regard to the true nature of the injected substance. United States v Dominguez, supra.

Charges of attempted rape seem uniformly to have allowed legal impossibility as a defense when a juridical impediment was found to prevent the consummation of the crime. Thus, in Frazier v State, 48 Tex Crim 142, 86 SW 754 (1905), it was concluded to be legally impossible for a husband to be convicted of the attempted criminal violation of his wife's person. And in Foster v Commonwealth, 96 Va 306, 31 SE 503 (1898), a jurisdiction applying the common-law's conclusive presumption of legal incapacity of a boy under the age of fourteen to commit rape determined that, because of such presumption, he could not be convicted of attempted rape. The court said, at page 505:

"The accused being under 14 years of age, and conclusively presumed to be incapable of committing the crime of rape, it logically follows, as a plain legal deduction, that he was also incapable in law of an attempt to commit it. He could not be held to be guilty of an attempt to commit an offense which he was physically impotent to perpetrate."

Where, however, a jurisdiction holds to the view that a boy's age as less than fourteen years creates only a *rebuttable factual* presumption of noncapacity, it also is concluded that there may be a conviction of attempted rape by such an individual. Davidson v Commonwealth, 20 Ky Law Rep 540, 47 SW 213 (1898). So, also, is the defense of legal impossibility unavailable in the case of individuals above the common-law age of legal capacity who, for physical reasons, are impotent and thus unable to consummate the crime of rape. Preddy v Commonwealth, 184 Va 765, 36 SE2d 549 (1946).

It seems to me that, from the foregoing authorities—representative as they are of the welter of decisions in this field—definite principles may be derived which, when applied to the facts depicted in the record before us, lead inevitably to the conclusion that accused's conviction of attempted rape must be vitiated on the basis of legal impossibility. In the homicide cases, we find in every instance a victim in being upon whom the crime could have been committed and, except in Stokes v State, supra, in proximity to the scene of the actual attempt. Even in the *Stokes* case, the intended victim customarily traveled the route upon which the ambush was laid, and the

**299**

Mississippi Court made much of the fact that nothing remained to be done, insofar as acts were concerned, except to pull the trigger when the victim came fairly within the assassin's sights. In short, the intended victim's absence is simply a *factual* matter.

In the false pretense cases, again we find victims in being and defendants who have done everything necessary to the commission of the consummated crime except to convince their quarry of the validity of the confidence game. Their crimes were unsuccessful not because of legal considerations but only because of the fact that, in each instance, the actors underestimated the acumen of their human targets.

The same is true of one who possesses or uses milk sugar, believing it to be a narcotic preparation. People v Siu, supra; United States v Dominguez, supra. There is no legal impediment to conviction, for the accused has merely made a factual mistake concerning the identity of the supposed contraband, just as does the defendant who seizes a woman, intending to ravish her, but finds himself, for physical reasons, unable to effect penetration. Preddy v Commonwealth, supra; Territory v Keyes, 5 Dak 244, 38 NW 440 (1888); Hunt v State, 114 Ark 239, 169 SW 773 (1914).

In contrast to these cases upholding convictions of attempts wherein, but for the fact of absence, disbelief, poor aim, and physical inability to accomplish the result sought, are those in which there is, so to speak, no "victim in being." Thus, we find that one cannot attempt to influence a juror who is not a juror. State v Taylor, supra; State v Porter, supra. One cannot attempt to pursue a deer which is nothing more than a stuffed hide. State v Guffey, supra. One cannot attempt to kill by firing into a corpse or commit rape upon a mannequin. 1 Bishop, A Treatise on Criminal Law, 9th ed, § 742; State v Taylor, supra; State v Guffey, supra. Nor can one attempt to receive stolen goods which are not in fact stolen, People v Jaffe, supra, or attempt rape where he legally has no

capacity so to act, Foster v Commonwealth, supra.

In each of these instances, there is simply no "victim" or thing which the particular law intended to be broken is designed to protect. Thus, embracery statutes are designed to protect jurors rather than those whom an accused believes to be jurors. Only *stolen* goods are within the proscription against attempts to receive. Only a deer can be the subject of an attempt to hunt deer. In short, the subject matter of accused's acts must be one within the prohibition of the particular statute which he is alleged to have violated, no matter what his personal belief may be, so that he could have been convicted of the consummated crime had he been entirely successful.

No series of cases more clearly portray this distinction than those which deal with the legal incapacity of a boy under fourteen years of age to attempt rape as compared to those which hold simple physical impotency to be no such bar to conviction. In the one instance, the actor, because of a pure rule of law, is incapable of violating a woman, regardless of his actual precocity. In the other, there is no legal bar, the inability being a fact resulting from some disease, disability, or infirmity of which the law refuses to take notice.

In like manner, the barrier to consummation of the crime charged here is not factual but legal. Indeed, accused did everything they set out to do, but they admittedly could not commit the actual crime of rape because their victim was dead and thus outside the protection of the law appertaining to that offense. Because the objective of their loathsome attentions was no longer subject to being raped, it seems to me that there cannot be any liability for an attempt, for, just as in the case of the lad under the age of fourteen, the stuffed "deer," and the nonjuror, a legal rather than a factual impediment existed to the offense's consummation. In brief, this is not the case of an empty pocket but one in which there was no pocket to pick. And, as is succinctly stated in the Manual, supra, at page 305:

"It is not an attempt when every act intended by the accused [sexual intercourse with a woman in fact dead] could be completed without committing an offense [rape], even though the accused may at the time believe he is committing an offense [rape]."

Finally, I believe that the position which my brothers take unnecessarily emphasizes the accused's mental frame of reference at the expense of what they actually did. The common-law concept that danger to society lay chiefly in action rather than in thought has much to commend it, based as it is upon centuries of experiential development. Particularly, however, is this true in the armed services, furnished as they are with general articles of the Code within whose scope conduct potentially invasive of any important social interest easily falls. See Code, supra, Articles 133, 134, 10 USC §§ 933, 934. Indeed, such is the course which was wisely followed here, for accused's reprehensible behavior was charged as—and so sustained by the board of review—lewd and lascivious conduct in violation of Code, supra, Article 134. With the propriety of that conclusion, I am certain that none of us argue. When, however, it is found that such acts, albeit legally incapable of consummation, are also punishable as attempted rape, I believe we so widen the thrust of Code, supra, Article 80, that we permit punishment to be predicated upon one's plans quite without regard to whether they may legally be completed. The door, therefore, is left open for the protection of logs against homicidal attack and of the supposed honor of dressmaker's dummies. And to those who, as does Professor Hall, believe that these are hypotheses from Never-Never Land, I recommend the reading of the transcript before us.

Despite my position with respect to the charge of attempted rape, I would affirm the conviction of conspiracy to commit rape. Unlike criminal attempts, legal impossibility is not recognized as a defense to a charge of conspiracy. United States v Ventimiglia, 145 F Supp 37 (D Md) (1956) ; United States v Foster, 9 FRD 367 (SD NY) (1949). Although both crimes are, in a sense, inchoate offenses, their development has been somewhat different. At common law, conspiracy consisted only of the agreement to do an unlawful act or a lawful act in an unlawful manner. Clark and Marshall, A Treatise on the Law of Crimes, 6th ed, § 126. Although Code, supra, Article 81, 10 USC § 881, requires proof of an overt act in addition to the agreement to commit an offense under the Code, we have held that the heart of the crime remains the corrupt meeting of the minds. United States v Yarborough, 1 USCMA 678, 5 CMR 106; United States v Nathan, 12 USCMA 398, 30 CMR 398; United States v Kidd, 13 USCMA 184, 32 CMR 184. Here, the accused agreed to have intercourse with an unconscious girl against her will and while she was unable to resist. The averred overt act was also made out. As what these two men thus subjectively agreed to be their objective constitutes in law the offense of rape, in violation of Code, supra, Article 120, 10 USC § 920, and as thereafter one of them performed an overt act, guilt of conspiracy is made out. My objection is simply to the action of my brothers in transferring the subjective approach in conspiracy to the objective questions involved in attempts.

For these reasons, I would affirm the decision of the board of review in part and reverse it in part.