262 S.W.2d 152 (1953)
STATE
v.
GUFFEY et al.
No. 7209.
Springfield Court of Appeals. Missouri.
November 6, 1953.
Tom A. Shockley, Waynesville, for appellants.
Ronald J. Fuller, Rolla, for respondent.
VANDEVENTER, Presiding Judge.
Appellants were convicted of violating Section 252.040, V.A.M.S. and regulations of the Missouri Conservation Commission and have appealed. The section of the statute is as follows:
"No wild life shall be pursued, taken, killed, possessed or disposed of except in the manner, to the extent and at the time or times permitted by such rules and regulations; and any pursuit, taking, killing, possession or disposition thereof, except as permitted by such *153 rules and regulations, are hereby prohibited. Any person violating this section shall be guilty of a misdemeanor."
This information charges that on the 12th day of September, 1952, the defendants in Phelps County, Missouri, did "willfully and unlawfully hunt, pursue, and attempt to take, with the use of firearms, a deer during the prescribed closed season; * * *," contrary to the statute and the wild life code. The part of the code referred to is Section 33, which provided that deer may be pursued and taken with firearms in the year 1952, only between the hours of 6:30 a. m. and 5:00 p. m. from "December 4th to December 6th."
The State's evidence shows that Conservation agents, about two weeks before the alleged offense, had procured the hide of a 2½ year old doe which had been killed by an automobile in Pulaski County. They had taken it to a taxidermist, who soaked it to soften it, stuffed it with excelsior and boards, inserted rods in the legs so it would stand upright and used the doe's skull in the head part of the hide so it would hold its former shape. For eyes, which had not been preserved, two small circular pieces of scotchlight reflector tape of a "white to amber color", had been placed over the eyeless sockets.
Four of these agents, Gretlein, Reed, Allen and Pugh, with the dummy deer in tow, met at "The Devil's Elbow" about 7:30 p. m. September 12th and then proceeded with this stuffed deer hide to what was described as the "Spring Creek Area" where they were reinforced by four other agents, Pritchard, Hartsock, Wilson and Feltz. The dummy was placed in a field, about fifty yards from the north side of an old road in Phelps County several miles southwest of Newburg, the old road running in an easterly direction from Highway J., so it could be seen by anyone coming along the road. The eight Conservation agents, fully armed, then concealed themselves in the brush on the south side of the road opposite the dummy and awaited the arrival of some citizen who might come that way, see the tempting bait and with visions of odoriferous venison cooking in pot or pan, decide not to wait until the 4th of December to replenish his larder. There had been some general complaints against violators for shooting deer and cattle and "spot-lighting" in this neighborhood, but there is no evidence that defendants were complained of or suspected.
About 9:15 o'clock an automobile, at a speed of about 30 miles per hour, passed going east and which the agents thought was a Chevrolet Sedan of the vintage of 1939 to 1941. No spotlights were noted as this car passed. About an hour later, a car was observed coming from the east on this road at a speed of 10 or 15 miles per hour and in addition to the headlights, it had two spotlights, one on each side, sweeping the countryside and piercing the darkness with their beams. As the car neared the place where the agents were concealed, one of the beams fell on the stuffed deer and someone in the car was heard to exclaim, "Wait, there stands one." The car stopped, backed up ten to fifteen feet, the spotlight on the left side was extinguished and the one on the right side of the car was trained upon the dummy deer. Immediately after the car stopped, there was a blast of a shotgun, which was fired by a man on the right side of the front seat, who was later identified as defendant Hoss. The agents converged upon the Chevrolet, and its occupants, seized the spotlights, a flashlight, the shotgun, an empty shell, and a loaded shell, the latter containing what was referred to as a "rifled slug." Proper "seizure receipts" were given for the articles taken by the agents and they told the occupants of the car to drive to Rolla and meet them at the fire station there in about an hour. This order was obeyed and the occupants of the Chevrolet proceeded on to Rolla some 15 minutes ahead of the agents, did meet them and were then ordered to appear at the magistrate's court the next day. They obeyed instructions and at that time charges were filed against the two appellants.
*154 The State's evidence further showed that there were no holes of any consequence in the stuffed hide until after the shotgun blast, but that a subsequent examination of the dummy revealed a small hole in its right side just behind the right foreleg and a larger hole on the lower left flank in front of the "left rear leg". This second hole was larger than the first one, in fact, it was so large that part of the excelsior had come out and it was necessary for the agents to do some emergency re-stuffing to keep the dummy from "collapsing". It was the considered expert opinion of the agents that a slug had entered at the little hole and made its exit at the larger one. In fact, the State's evidence indicated that defendant Hoss, to use a colloquial expression, had shot the "stuffing" out of the dummy deer, with a shotgun loaded with a "rifled slug." There was no evidence of a real live deer being anywhere in the vicinity.
The defendants' evidence showed that Mr. and Mrs. Guffey were friends of Mr. and Mrs. Hoss, they visited frequently, in fact, several times each week. On the afternoon in question, Mr. Guffey and his wife had driven from Rolla to Mr. Hoss' house, who lived in the vicinity of the scene of the shooting. It was their intention to get Mr. Hoss and go on over east of their place to a lake or pond (known as "Caney's Sink, Caney's Pond or Caney's Anchorage") and catch some frogs and the two spotlights and flashlight that they had taken with them were necessary paraphernalia for frog hunting. As defendant Guffey and his wife were approaching Hoss' house and near the vicinity of the locus in quo, they observed a wolf run across the road. When they arrived at the home of their friends, the Hosses, he told him about seeing the wolf and suggested that they take a gun with them over to the pond as they might see the wolf on the way and have an opportunity to slay it. This suggestion was acted upon, Hoss took his shotgun and two cartridges loaded with slugs, which was all the ammunition he had, and they left Mr. Hoss' house on the frog-hunting expedition, the two men riding in the front seat and their wives in the back. It was their car that had been observed by the agents proceeding in an easterly direction on this road. They went on over to Caney's Pond, spent 35 or 40 minutes frog hunting and then returned and as they approached the place where the agents were concealed, they were using the spotlight on the right side of the car in an effort to locate the aforesaid wolf. While the golden beams of the light were piercing the darkness, they met and reflected from the imitation eyes of the deer and someone in the car remarked, "Hold, I see it out there." "It" referred to what they thought was a wolf. They did back up ten or fifteen feet and defendant Hoss did shoot at the eyes, thinking they were the living orbs of a wolf. The appellants were later informed against, eventually tried and convicted and here they are.
It is earnestly argued by appellants that the evidence does not show the violation of any law; that though the mountain labored, it did not even bring forth a mouse. On the other hand, the representatives of the State argue that while the information charged that the defendants did "hunt, pursue, and attempt to take, with the use of firearms, a deer, * * *" etc., that the word "hunt" and the words "attempt to take" if they have any meaning at all, and are not entirely surplusage, are synonymous with "pursue" and that the evidence does show that defendants did pursue a deer. The State then argues that one of the meanings of the word "pursue" is to "seek" and that the facts that defendants were going along the highway in an automobile with spotlights and a shotgun and did take a shot at the dummy deer proves that they did "seek" a deer, which being synonymous with "pursue" made them guilty of violating Section 252.040 and the regulations referred to.
To sustain this argument they cite and quote from Webster's International Dictionary which defines the word "pursue". Webster does define that word and his first definition is: "1. To follow with a view to overtake; to follow eagerly, or with haste; to chase; as to pursue a hare." Webster also defines the word "pursue" as *155 follows: "2. To seek; to use or adopt measures to obtain; specif., Law, to follow or seek by judicial proceedings; to prosecute; as, he pursued his legal remedies." It is clearly apparent that the first definition above is the proper and only definition of "pursue" that applies to the facts in this case.
We have further consulted another eminent authority, Funk & Wagnalls, Standard Dictionary of the English Language, where "pursue" is there defined: "1. To follow persistently with the purpose of seizing or obtaining; chase; hunt as to pursue a fugitive from justice; to pursue game." They also have another definition: "2. Figuratively, to endeavor persistently to attain or gain; seek; as to pursue pleasure." Another definition in the Standard dictionary is "To follow."
"Pursuer" is defined as "1. One who pursues; one who follows in order to overtake."
"Pursuit" is defined as: "1. The act of pursuing. (1) a following eagerly in order to overtake or obtain; a chase, either in sport or in hostility; as the pursuit of game; pursuit of a murderer." This authority was cited in the case of Tatum v. State, 57 Ga.App. 849, 197 S.E. 51, loc. cit. 54, where they held that a pursuer is one that pursues, one who follows in order to overtake.
Webster's Dictionary of Synonyms lists "Follow, chase, trail, tag, tail" as synonymous with "Pursue", but no place does it list the word "seek".
In the case of State ex rel. Malone, County Attorney, v. Dreiling, Justice of the Peace, 136 Kan. 78, 12 P.2d 735, 736, the Supreme Court of Kansas construed a statute which authorized an officer to whom a warrant of arrest was directed, to "pursue and apprehend the party charged in any county in this state * * *", etc. R.S.Kan. § 62-603. The court said "the word "pursuit" is used in the sense of chasing, or following to overtake." It was then held that a constable could only serve warrants in his own county except that he may "pursue and apprehend the party charged in any county in this state, * * *", but he could not go into another county where the defendant might be and arrest him except in what amounts to "fresh pursuit".
Bearing these definitions in mind, it seems to us that the State has wholly failed to make its case when it stands upon the proposition that defendants "pursued" a deer. In the first place there was no deer. The hide of a doe long since deceased, filled with boards, excelsior and rods with eyes made of a reflective scotch tape, was not a deer within the meaning of the statute and Section 33 of the "Wildlife Code of Missouri". The dummy, such as it was, was a stationary affair, it could not run, could not jump, it could not flee from the rifle slug of a hunter. It was not wild and it had no life.
The regulations provide that deer may be "pursued and taken" on three certain days in the year and when so taken, must immediately be submitted for inspection and proper marking. It cannot be divided into separate parts and the "various parts" possessed and transported until the undivided carcass is so presented to a duly authorized representative of the Conservation Commission for inspection and the various parts identified by the official stamp. Furthermore, "The head of any deer shall remain attached to the carcass thereof until identified by the official stamp as herein provided." We do not think it was the intention of the Commission to include within Section 33 a dummy, such as was here used, and which only had a dried hide to identify it as a deer. There was no "head" to be left attached to the "carcass" and no "carcass" for it to be attached to. The stamp of approval would have to be placed on excelsior, boards, rods and a dry hide. We hardly believe the Commission in promulgating Section 33 intended this absurd result.
Undoubtedly the words "pursued" as used in the statute and "pursue" as used in Section 33 of the Code means to follow with the intention of overtaking, or to chase.
*156 A deer's part in such a pursuit or chase is clearly described by the Scottish Bard, Sir Walter Scott, in "The Lady of the Lake, Canto First, The Chase."
"The antler'd monarch of the waste Sprung from his heathery couch in haste
Then, as the headmost foes appear'd With one brave bound the copse he clear'd
And stretching forward free and far, Sought the wild heaths of Uam-Var."
It is difficult for us to visualize the dummy with is tottering legs, synthetic eyes and vitals of shredded wood, springing from its couch, bounding a copse (should there have been any copses in the neighborhood of Devil's Elbow or Spring Creek area) and "stretching forward free and far" seeking other fields. It could hardly stand alone and almost collapsed from loss of excelsior after it was shot.
Neither is the State's contention bolstered any by the fact that the information contains the word "hunt" and "attempt to take". The word "hunt" is not included in the statute or Section 33 of the Code. It is true that the resolution of the Conservation Commission (Sec. 33) used the words "pursued and taken", "take and pursue", "take and possess", "pursued or taken" several times but the context of that section clearly shows that it is referring to a live deer and not to a stuffed hide. The State's evidence shows that one of the defendants did shoot the dummy but did they pursue, chase or follow a deer by shooting this stuffed defunct doe hide? It was not a deer. If the dummy had been actually taken, (it could not be pursued) defendants would not have committed any offense. It is no offense to attempt to do that which is not illegal. See Burdick's Law of Crime, Vol. 1, Sec. 143, et seq. (1946). Neither is it a crime to attempt to do that which it is legally impossible to do. For instance, it is no crime to attempt to murder a corpse because it cannot be murdered. See State v. Taylor, 345 Mo. 325, 133 S.W.2d 336, loc. cit. 341.
"Neither can one be convicted of an attempt to commit a crime unless he could have been convicted if his attempt had been successful; thus, where the act, if accomplished, would not constitute the crime intended, as a matter of law, then there is no indictable attempt." 22 C.J.S., Criminal Law, § 74, page 138.
"If all which an accused person intends to do would, if done, constitute no crime, it cannot be a crime to attempt to do with the same purpose a part of the thing intended. 1 Bishop's Crim.Law (7th Ed.) § 747." People v. Jaffe, 185 N.Y. 497, 78 N.E. 169, 170, 9 L.R.A.,N.S., 263, 7 Ann.Cas. 348.
A full discussion of the question may be found in the leading case last cited above.
If the State's evidence showed an attempt to take the dummy, it fell far short of proving an attempt to take a deer. We hold that the State wholly failed to make a case.
Appellants contend that there was an unlawful search and seizure, also that they were entrapped by the agents of the Missouri Conservation Commission. From the view we take of this case, it is unnecessary to pass upon these questions.
The judgment and sentence of the trial court should be reversed and the appellants discharged. It is so ordered.
BLAIR and McDOWELL, JJ., concur.