John Fletcher BOOTH, Jr.,
Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant
in Error.

No. A-13423.

Court of Criminal Appeals of Oklahoma.

Dec. 23, 1964.

Rehearing Denied Feb. 17, 1965.

George L. Hill, McAlester, Holly L. Anderson, Tulsa, for plaintiff.

David Hall, County Atty., and Ted Flanagan, Asst. County Atty., Tulsa County, Tulsa, for defendant.

Malcolm Baucum and Carrol Samara, Oklahoma City, attorneys for plaintiff in error.

Charles Nesbitt, Atty. Gen., Jack A. Swidensky, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

John Fletcher Booth, Jr., was charged by information in the District Court of Oklahoma County with the crime of Receiving

Stolen Property, and was found guilty of the lesser crime of Attempt to Receive Stolen Property. The jury assessed his penalty at Two Years in the Oklahoma State Penitentiary, and to pay a fine in the amount of $150.00. From said judgment and sentence the defendant appeals.

The record before this Court reveals that this case arose out of a circumstance as testified to by a self-admitted, well-known thief bearing the name of Charley Stanford, whose FBI "rap sheet" covers 8 pages of arrests extending over a period of 15 years. He was obviously braggadocio about his convictions and related from the witness stand that he had been arrested approximately 300 times on everything in the book, short of murder and rape. He admitted serving 4 terms in the penitentiary, and having been committed to a mental institution twice. He testified, in substance, that in the early morning hours he was walking in the parking lot at the YMCA in Oklahoma City and sighted a topcoat in a parked automobile. That he jimmied the window and removed the coat, took it to his home at 308 N.E. 8th Street, where he retired until about 7:00 at which time he proceeded down to a pay telephone where he called his attorney (the defendant herein). He testified that he advised him he had the coat he had ordered, and agreed to let him have the coat for $20.00. Arrangements were made for the defendant to meet him at the thief's home at approximately 11:00 A.M. where the transfer was to be made. He returned home, and a friend came by and invited him to go get a drink. He started from his house to his friend's car and was arrested by Lt. Anthony of the Oklahoma City Police Department. He was wearing the stolen coat at the time of his arrest. Lt. Anthony took Stanford to the police station, and asked him where he had gotten the coat and he confessed getting it from the car in the YMCA parking lot.

Lt. Anthony testified, in substance, that he received an anonymous telephone call at approximately 7:00 a. m. on the morning of the day in question, and proceeded to the YMCA and located the owner of the vehicle that had been burglarized. They went then to the vehicle and observed the wing glass had been broken, pried open, and a gray cashmere coat and some shirts were missing. Officer Anthony proceeded to the 300 block on N.E. 8th and saw an ex-convict by the name Charley Stanford leaving his house wearing a gray cashmere coat. Anthony then and there arrested Stanford for Burglary and took him to the police station. He then called Mr Gothard to the police station, where he identified the coat as his and asked Lt. Anthony for the coat, but was advised that they needed it as evidence. Officer Anthony, Officer Reading and Stanford proceeded to 308 N.E. 8th taking the recovered coat with them. After arriving, they took their position behind a closet door containing "peep-holes" and waited for the arrival of defendant Booth. According to the testimony of Anthony, the following transpired:

"A. We then went back to the 300 block on 8th Street and I concealed myself in the closet and Mr. Stanford stayed in the other part of the house which was a combination of or the apartment was a combination of a kitchen with a divan on the west side of the room. He laid the overcoat on the divan. And in the door of this clothes closet there was small pin holes and I left the door ajar slightly. Shortly after eleven o'clock Mr. John Booth came to the front door. * * *

"Q. May I ask you and interrupt you at this point. Is that person in the courtroom?

"A. Yes sir.

"Q. Would you please point him out to the Court and Jury, Officer?

"A. That person. (Points to defendant, John Booth)

"Q. Go ahead.

"A. Booth entered the house, and I heard Charlie say. * * *

"BY THE COURT: (Interrupting) Who do you mean by Charlie:

"A. Charlie Stanford.

"BY MR. THOMAS:

"Q. Then what?

"A. I heard Charlie Stanford say, 'John, I got the coat which you wanted.' 'I need the twenty dollars right away.' And Mr. Booth said, 'This is child support month, Charlie, come to my office later and I will give you a check.' There was other conversation.

"Q. Was there any other conversation relative to the deal?

"MR. BAUCUM: Now we are going to object to that as leading and very suggestive, Your Honor.

"BY THE COURT: That's leading and suggestive.

"BY MR. THOMAS: I was just asking about the conversation.

"BY THE COURT: I know, but it has all the import of being one. You go ahead and ask the question, and the court will sustain the objection or overrule it, which ever is proper. Don't suggest anything to him.

"BY MR. THOMAS:

"Q. Officer Anthony you testified about * * *. STRIKE THAT. Officer Anthony, how long was Mr. Booth in the house? With Charlie Stanford?

"A. I would judge about ten minutes.

"Q. At which time you were in the closet?

"A. Yes, sir.

"Q. With the door ajar?

"A. Yes, sir. But I was looking mostly through the small pin holes.

"Q. Were you able to look through the holes?

"A. Yes, sir.

"Q. Tell what you observed.

"A. They came into this particular room. * * *

"Q. Who is 'they'?

"A. John Booth and Charlie Stanford. They * * * well, Booth picked up the coat in his arms and there was conversation of and he warned him that the thing was 'hot'.

"Q. Who warned who?

"A. Charlie Stanford warned John Booth that the thing was 'hot'.

"Q. That the coat was 'hot'?

"A. Yes, that's the way he termed it.

"Q. What did Mr. Booth say?

"A. He said, 'well, I know how to handle things like this, don't worry about it, Charlie.'

"Q. Then what happened?

"BY MR. SAMARA: I object your honor, it is going beyond the scope of direct examination. And involving matters that are unconcerned.

"BY THE COURT: The objection will be overruled.

"BY MR. THOMAS:

"Q. You testified that Charlie Stanford told him the coat was 'hot'.

"A. He warned him the coat was hot, it was criminal talk, hot or stolen.

"Q. What did Booth say?

"A. Booth said, 'I know how to handle these things'.

"Q. 'I know how to handle these things'?

"A. Yes, and 'don't worry about it, Charlie.'

"Q. Then what happened?

"A. At this point they went into a rest-room and what went on in there, I didn't hear. Then they came back out, and Booth went to his car and put the coat in the turtle-back of his car and then returned to the house and that is about all that occurred.

"Q. Altogether then Mr. Booth was in Charlie Stanford's house about how long?

"A. About ten minutes.

"Q. Did he leave?

"A. Yes, he left."

After taking Stanford to the police station, Anthony obtained a search warrant and then maintained a surveillance of Booth's house until he arrived. He then entered the premises, arrested Booth, and again recovered the coat.

Though defendant Booth was charged with Receiving Stolen Property, at the conclusion of the evidence and after the state and defendant had rested their case, the trial judge gave the following instruction:

"You are instructed that under the law of this case you are at liberty to consider only the included offense of whether the defendant John Fletcher Booth may be guilty of the crime of Attempt to Receive Stolen Property. In this regard you are instructed, an attempt to commit a crime is defined as being the compound of two elements.

"(1) The intent to commit a crime. (2) A direct ineffectual act done towards its commission.

"Preparation alone to an attempt to commit a crime is not sufficient. * *"

No doubt this instruction was given based upon the theory that once stolen property has been recovered by the police it loses its character as stolen property. This appears to have been the contention of defense counsel as reflected by the record. When defendant rested his case, the following Motions were made:

"Comes now the defendant at the close of the evidence of the state heretofore rested their case and demurs to the evidence for the reason that the same is wholly insufficient to establish the crime of Receiving Stolen Property or any lesser included offense and further request that the court at this time to direct the jury to bring in a verdict of Not Guilty."

(Overruled by the Court, Exceptions allowed.)

Then the following Motion was made by defense counsel:

"The defendant at this time renews his motion to quash the information for the reason that the evidence introduced in this trial substantially shows that the crime of Receiving Stolen Property could not have been committed under the circumstances of this case, to-wit: The fact that the officers and all of the state's witnesses admitted that the alleged stolen coat had been recovered by the police, that the owner had identified it, that the police checked it and later turned it over to a thief for the purpose of delivery to this defendant."

(Overruled and exception.)

The trial judge then adjourned court until the following day, stating that there were no guide-lines or guide-posts in this state and that it would take some little time to prepare the instructions. Thus the prepared instruction number two as heretofore recited was given.

In view of said instruction, we are justified in assuming that the trial judge and all parties concerned were in agreement. That under the testimony in the instant case, the coat had lost its' character as stolen property when recovered by the police, and the owner apprised of the recovery and identified the coat as the one taken from him.

██ The general rule evidently adopted by the trial court is stated in 76 C.J.S. Receiving Stolen Goods § 5, pg. 7, as follows:

"In order to convict of receiving stolen goods, the goods in question must have retained their stolen character at the time they were received by accused; if they were stolen, they continue to be stolen goods until they are recovered by their owner or some one for him. Hence, where the actual physical possession of stolen goods has been re-

covered by the owner or his agent and afterwards carried to the receiver either by the original thief or the instrumentality through which the thief originally intended to convey it, at the express direction of the owner or his agent, for the purpose of entrapping the receiver, his receiving of the goods is not a receiving of stolen goods."

The rule, well stated, is to be found in U. S. v. Cawley, 255 F.2d 338 (Circuit Court of Appeals for 3rd Circuit):

"When stolen goods are recovered by owner or his agent before they are sold, goods are no longer to be considered stolen, and purchaser cannot be convicted of receiving stolen goods."

In People v. Finkelstein, 21 Misc.2d 723, 197 N.Y.S.2d 31, (1960) the court said:

"A defendant may not be convicted for receiving stolen property if property is no longer in category of stolen property when he receives it."

The law seems to be clear on this point, leaving the only question to be decided as whether or not the defendant could be convicted of an attempt to receive stolen property in such cases. It is the defendant's contention that if he could not be convicted of the substantive charge, because the coat had lost its character as stolen property; neither could he be convicted of an attempt because the coat was not in the category of stolen property at the time he received it.

The briefs filed in the case, and extensive research has revealed that two states have passed squarely on the question—New York and California. It is definitely one of first impression in Oklahoma.

The New York Court, in passing upon the question, laid down the following rule in the case of People v. Jaffe, 185 N.Y. 497, 78 N.E. 169, 6 L.R.A.,N.S., 263, on the following facts:

"A clerk stole goods from his employer under an agreement to sell them to accused, but before delivery of the goods the theft was discovered and the goods were recovered. Later the employer redelivered the goods to the clerk to sell to accused, who purchased them for about one-half of their value, believing them to have been stolen.

"Held, that the goods had lost their character as stolen goods at the time defendant purchased them, and that his criminal intent was insufficient to sustain a conviction for an attempt to receive stolen property, knowing it to have been stolen."

The Jaffe case, supra, was handed down in 1906, and has prevailed as the law in New York state 58 years without modification—being affirmed in People v. Finklestein, supra; People v. Mills, 178 N.Y. 274, 70 N.E. 786, 67 L.R.A. 131; People v. Teal, 196 N.Y. 372, 89 N.E. 1086, 25 L.R.A.,N.S., 120; People v. Jelke, 1 N.Y.2d 321, 152 N.Y.S.2d 479, 135 N.E.2d 213; and finally, in the case of People v. Rollino (1962), 37 Misc. 2d 14, 233 N.Y.S.2d 580.

The State of California has passed upon the question several times and up until 1959, they followed the rule laid down in the Jaffe case, supra. (See, People v. Werner, 16. Cal.2d 216, 105 P.2d 927; People v. Schroder, 132 Cal.App.2d 1, 281 P.2d 297; People v. Zimmerman, 11 Cal.App. 115, 104 P. 590 (Calif).)

In 1959, in the case of People v. Camodeca, 52 Cal.2d 142, 338 P.2d 903, the California Court abandoned the Jaffe rationale that a person accepting goods which he believes to have been stolen, but which was not in fact stolen goods, is not guilty of an attempt to receive stolen goods, and imposed a liability for the attempt, overruling its previous holding to the contrary in the above cited cases. The Camodeca case, supra, was affirmed in People v. Rojas, 55 Cal.2d 252, 10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252, 1961.

■■ Though the instant case, insofar as it pertains to the specific crime of attempting to receive stolen property is one of first impression in Oklahoma. This Court held in the Nemecek v. State, 72 Okl.

Cr. 195, 114 P.2d 492, 135 A.L.R. 1149, involving attempting to receive money by false pretenses:

"An accused cannot be convicted of an attempt to commit a crime unless he could have been convicted of the crime itself if his attempt had been successful. Where the act, if accomplished, would not constitute the crime intended, there is no indictable attempt."

In the Nemecek case, supra, the Court quotes with approval, In re Schurman, 40 Kan. 533, 20 P. 277; wherein the Kansas Court said:

"With reference to attempt, it has also been said that 'if all which the accused person intended would, had it been done, constitute no substantive crime, it cannot be a crime, under the name "attempt," to do, with the same purpose, a part of this thing.' "

The two paramount cases of latest date; Rojas of Calif.1961, supra, and Rollino of New York 1962, supra; present two rationales directly contrary to each other relative to an attempt to receive stolen property after it had been recovered by the police.

Before adhering too closely to either rationale, it is deemed advisable to briefly discuss the development of the "attempt to commit crimes" and the complexity pertaining thereto.

A thorough historical background of "attempt to commit crimes" is given by J. Irwin Shapiro, Justice of the Supreme Court, Queens County, Post 11, N. Y. It is to be found in the Rollino case, supra. In that case, Judge Shapiro relates in substance that the development of attempts apparently stems from the decision of the Kings Bench in Rex v. Schofield, Cald. 397 (1784). There, the defendant was tried for arson. He had placed a lighted candle among combustibles in a certain house, with intent to burn it. There was, however, no proof of burning adduced. The court held that the COMPLETION of the criminal act was not required to constitute criminality if the attempt was committed with the necessary intent. It logically inquired:

"* * * Is it no offense to set fire to a train of gunpowder with intent to burn a house, because by accident, or the interposition of another, the mischief is prevented?"

That attempts were indictable as such was restated and definitively determined in Rex. v. Higgins, 2 East 5 (1801). Fifty-six years later, the question of "impossibility" was raised for the first time in Regina v. McPherson, Dears. & B. 197, 201, (1857), when Baron Bramwell said:

"* * * The argument that a man putting his hand into an empty pocket might be convicted of an attempt to steal appeared to me at first plausible; but suppose a man, believing a block of wood to be a man who was his deadly enemy, struck it a blow intending to murder, could he be convicted of attempting to murder the man he took it to be?"

Subsequently, in Regina v. Collins, 9 Cox C.C. 497, 169 Eng.Rep. 1477 (1864), the Court expressly held that attempted larceny was not made out by proof that the defendant pickpocket actually inserted his hand into the victim's pocket with intent to steal. Chief Justice Cockburn, declaring, at page 499:

"We think that an attempt to commit a felony can only be made out when, if no interruption had taken place, the attempt could have been carried out successfully, and the felony completed of the attempt to commit which the party is charged."

This very broad language, encompassing as it did all forms of "impossibility", was subsequently rejected by the English courts and it was held that the inability of the pickpocket to steal from an empty pocket did not preclude his conviction of an attempted larceny. Regina v. Ring, 17 Cox C.C. 491, 66 L.T.(N.S.) 306 (1892).

In this country it is generally held that a defendant may be charged with an attempt

where the crime was not completed because of "physical or factual impossibility", whereas a "legal impossibility" in the completion of the crime precludes prosecution for an attempt. (Smith, "Two problems in Criminal Attempts", 70 Harvard Law Review, 422.)

What is a "legal impossibility" as distinguished from a "physical or factual impossibility" has over a long period of time perplexed our courts and has resulted in many irreconcilable decisions and much philosophical discussion by legal scholars in numerous articles and papers in law school publications and by text writers. See, for example: "Contemporary Problems of Criminal Attempts" by Paul Kichyun Ryu, Professor Law, Seoul University in Korea, 32 New York University Law Review, page 1170 (1957); "The Effect of Impossibility on Criminal Attempts" by John S. Strahorn, Jr., 78 University of Pennsylvania Law Review, page 962 (1930); "Criminal Attempts —The Rise and Fall of an Abstraction" by Honorable Thurman W. Arnold, Dean of University of West Virginia Law School and visiting Professor of Law at Yale (later Associate Justice, United States Court of Appeals for the District of Columbia), 40 Yale Law Journal, page 53 (1930); "Criminal Attempts" by Francis Bowes Sayre, Professor of Law, Harvard Law School, 41 Harvard Law Review, page 821 (1928); "Criminal and Non-Criminal Attempts" by John W. Curran, Professor of Law, DePaul College of Law, 19 George Town Law Journal, Part I, page 185—Part II, page 316 (1931); "Criminal Attempts at Common Law" by Edwin R. Keedy, Professor of Law Emeritus, University of Pennsylvania, 102 University of Pennsylvania Law Review, page 464 (1954).

■ The reason for the "impossibility" of completing the substantive crime ordinarily falls into one of two categories: (1) Where the act if completed would not be criminal, a situation which is usually described as a "legal impossibility", and (2) where the basic or substantive crime is impossible of completion, simply because of some physical or factual condition unknown to the defendant, a situation which is usually described as a "factual impossibility".

The authorities in the various states and the text-writers are in general agreement that where there is a "legal impossibility" of completing the substantive crime, the accused cannot be successfully charged with an attempt, whereas in those cases in which the "factual impossibility" situation is involved, the accused may be convicted of an attempt. Detailed discussion of the subject is unnecessary to make it clear that it is frequently most difficult to compartmentalize a particular set of facts as coming within one of the categories rather than the other. Examples of the so-called "legal impossibility" situations are:

(a) A person accepting goods which he believes to have been stolen, but which were not in fact stolen goods, is not guilty of an attempt to receive stolen goods. (People v. Jaffe, 185 N.Y. 497, 78 N.E. 169, 9 L.R.A.,N.S., 263).

(b) It is not an attempt to commit subornation of perjury where the false testimony solicited, if given, would have been immaterial to the case at hand and hence not perjurious. (People v. Teal, 196 N.Y. 372, 89 N.E. 1086. 25 L.R.A., N.S., 120).

(c) An accused who offers a bribe to a person believed to be a juror, but who is not a juror, is not guilty of an attempt to bribe a juror. (State v. Taylor, 345 Mo. 325, 133 S.W.2d 336).

(d) An official who contracts a debt which is unauthorized and a nullity, but which he believes to be valid, is not guilty of an attempt to illegally contract a valid debt. (Marley v. State, 58 N.J.L. 207, 33 A. 208).

(e) A hunter who shoots a stuffed deer believing it to be alive is not guilty of an attempt to shoot a deer out of season. (State v. Guffey, 262 S.W.2d 152 (Mo. App.).

Examples of cases in which attempt convictions have been sustained on the theory

that all that prevented the consummation of the completed crime was a "factual impossibility" are:

(a) The picking of an empty pocket. (People v. Moran, 123 N.Y. 254, 25 N.E. 412, 10 L.R.A. 109; Commonwealth v. McDonald, 5 Cush. 365 (Mass.); People v. Jones, 46 Mich. 441, 9 N.W. 486).

(b) An attempt to steal from an empty receptacle. (Clark v. State, 86 Tenn. 511, 8 S.W. 145) or an empty house (State v. Utley, 82 N.C. 556).

(c) Where defendant shoots into the intended victim's bed, believing he is there, when in fact he is elsewhere. (State v. Mitchell, 170 Mo. 633, 71 S.W. 175).

(d) Where the defendant erroneously believing that the gun is loaded points it at his wife's head and pulls the trigger. (State v. Damms, 9 Wis.2d 183, 100 N.W. 2d 592, 79 A.L.R.2d 1402).

(e) Where the woman upon whom the abortion operation is performed is not in fact pregnant. (Commonwealth v. Tibbetts, 157 Mass. 519, 32 N.E. 910; People v. Huff, 339 Ill. 328, 171 N.E. 261; and Peckham v. United States, 96 U.S.App. D.C. 312, 266 F.2d 34).

Your writer is of the opinion that the confusion that exists as a result of the two diverse rationales laid down in the Rollino case (NY) supra, and the Rojas case (Calif) supra, was brought about by the failure to recognize the distinction between a factual and a legal impossibility to accomplish the crime. In the Camodeca case (Calif) supra, the facts revealed a prevention of the crime because of a factual situation as stated on page 906, 338 P.2d:

"In the present case there was not a legal but only a factual impossibility of consummating the intended offense * * *."

In the Rojas case, supra, wherein was adopted the departure from the Jaffe case, by saying:

"The situation here is materially like those considered in People v. Camodeca."

The Rojas case was definitely not materially the same. In the Rojas case the facts reveal a legal and not factual impossibility.

■ In the case at bar the stolen coat had been recovered by the police for the owner and consequently had, according to the well-established law in this country, lost its character as stolen property. Therefore, a legal impossibility precluded defendant from being prosecuted for the crime of Knowingly Receiving Stolen Property.

It would strain reasoning beyond a logical conclusion to hold contrary to the rule previously stated herein, that,

"If all which the accused person intended would, had it been done, constituted no substantive crime, it cannot be a crime under the name 'attempt' to do, with the same purpose, a part of this thing."

If a series of acts together will not constitute an offense, how can it be said that one of the acts alone will constitute an indictable offense? Bishop Crim.Law § 747.

The rule is well stated by the English Court in the case of R. v. Perey, Ltd. 33 Crim.App.R. 102 (1949): DALTON,

"Steps on the way to the commission of what would be a crime, if the acts were completed, may amount to attempts to commit that crime, to which, unless interrupted, they would have led; but steps on the way to the doing of something, which is thereafter done, and which is no crime, cannot be regarded as attempts to commit a crime."

Sayre, 41 Harvard Law Review 821, 853–54 (1928) states the rationale in this manner:

"It seems clear that cases (where none of the intended consequences is in fact criminal) cannot constitute criminal attempts. If none of the consequences which the defendant sought to achieve constitute a crime, surely his unsuccessful efforts to achieve his object cannot constitute a criminal attempt. The partial fulfillment of an object

not criminal cannot itself be criminal. If the whole is not criminal, the part cannot be."

■ The defendant in the instant case leaves little doubt as to his moral guilt. The evidence, as related by the self-admitted and perpetual law violator indicates defendant fully intended to do the act with which he was charged. However, it is fundamental to our law that a man is not punished merely because he has a criminal mind. It must be shown that he has, with that criminal mind, done an act which is forbidden by the criminal law.

Adhering to this principle, the following example would further illustrate the point.

A fine horse is offered to A at a ridiculously low price by B, who is a known horse thief. A, believing the horse to be stolen, buys the same without inquiry. In fact, the horse had been raised from a colt by B and was not stolen. It would be bordering on absurdity to suggest that A's frame of mind, if proven, would support a conviction of an attempt. It would be a "legal impossibility".

Our statute provides that defendant must attempt to *Knowingly* Receive Stolen Property before a conviction will stand. How could one know property to be stolen when it was not? The statute needs to be changed so it would be less favorable to the criminal.

J. C. Smith, a Reader in Law, University of Nottingham, B.A., Cambridge, 1949, LL. B1, 1950, M. A., 1954, said in an article (70 Harvard Law Review 422) supporting the Jaffe case, supra, and the above reasoning:

> "If it appears wrong that the accused should escape unpunished in the particular circumstances, then it may be that there is something wrong with the substantive law and his act ought to be criminal. But the remedy then is to alter the substantive crime. Otherwise "there is no ACTUS REUS because 'the accident has turned up in

his favour'" and the accused ought to be acquitted. When a man has achieved all the consequences which he set out to achieve and those consequences do not, in the existing circumstances, amount to an ACTUS REUS it is in accordance both with principle and authority that that man should be held not guilty of any crime."

We earnestly suggest that the Legislature revise the law on Attempts in accordance with The American Law Institute for the adoption of a "Model Penal Code", which Article 5.01 defines "Criminal Attempts" in the following manner.

> "(1) DEFINITION OF ATTEMPT. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
>
> > "(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or,
> >
> > "(b) When causing a particular result in an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result, without further conduct on his part; or,
> >
> > "(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime."

The Clerk of this Court is requested to send a copy of this decision to the Legislative Council for consideration, as our Court can only adjudicate, it cannot legislate.

In view of our statutory law, and the decisions herein related, it is our duty to Reverse this case, with orders to Dismiss, and it is so ordered. However, there are other avenues open to the County Attorney which should be explored.

JOHNSON, P. J., and BUSSEY, J., concur.