Jasen, J.
The criminal law is of ancient origin, but criminal liability for attempt to commit a crime is comparatively recent. At the root of the concept of attempt liability are the very aims and purposes of penal law. The ultimate issue is whether an individual’s intentions and actions, though failing to achieve a manifest and malevolent criminal purpose, constitute a danger to organized society of sufficient magnitude to warrant the imposition of criminal sanctions. Difficulties in theoretical analysis and concomitant debate over very pragmatic questions of blameworthiness appear dramatically in reference to situations where the criminal attempt failed to achieve its purpose solely because the factual or legal context in which the individual acted was not as the actor supposed them to be. Phrased somewhat differently, the concern centers on whether an individual should be liable for an attempt to commit a crime when, unknown to him, it was impossible to successfully complete the crime attempted. For years, serious studies have been made on the subject in an effort to resolve the continuing controversy when, if at all, the impossibility of successfully completing the criminal act should preclude liability for even making the futile attempt. The 1967 revision of the Penal Law approached the impossibility defense to the inchoate crime of attempt in a novel fashion. The statute provides that, if a person engages in conduct which would *727 otherwise constitute an attempt to commit a crime, "it is no defense to a prosecution for such attempt that the crime charged to have been attempted was, under the attendant circumstances, factually or legally impossible of commission, if such crime could have been committed had the attendant circumstances been as such person believed them to be.” (Penal Law, § 110.10.) This appeal presents to us, for the first time, a case involving the application of the modern statute. We hold that, under the proof presented by the People at trial, defendant Melvin Dlugash may be held for attempted murder, though the target of the attempt may have already been slain, by the hand of another, when Dlugash made his felonious attempt.
On December 22, 1973, Michael Geller, 25 years old, was found shot to death in the bedroom of his Brooklyn apartment. The body, which had literally been riddled by bullets, was found lying faceup on the floor. An autopsy revealed that the victim had been shot in the face and head no less than seven times. Powder burns on the face indicated that the shots had been fired from within one foot of the victim. Four small caliber bullets were recovered from the victim’s skull. The victim had also been critically wounded in the chest. One heavy caliber bullet passed through the left lung, penetrated the heart chamber, pierced the left ventricle of the heart upon entrance and again upon exit, and lodged in the victim’s torso. A second bullet entered the left lung and passed through to the chest, but without reaching the heart area. Although the second bullet was damaged beyond identification, the bullet tracks indicated that these wounds were also inflicted by a bullet of heavy caliber. A tenth bullet, of unknown caliber, passed through the thumb of the victim’s left hand. The autopsy report listed the cause of death as "[m]ultiple bullet wounds of head and chest with brain injury and massive bilateral hemothorax with penetration of [the] heart.” Subsequent ballistics examination established that the four bullets recovered from the victim’s head were .25 caliber bullets and that the heart-piercing bullet was of .38 caliber.
Detective Joseph Carrasquillo of the New York City Police Department was assigned to investigate the homicide. On December 27, 1973, five days after the discovery of the body, Detective Carrasquillo and a fellow officer went to the defendant’s residence in an effort to locate him. The officers arrived at approximately 6:00 p.m. The defendant answered the door *728 and, when informed that the officers were investigating the death of Michael Geller, a friend of his, defendant invited the officers into the house. Detective Carrasquillo informed defendant that the officers desired any information defendant might have regarding the death of Geller and, since defendant was regarded as a suspect, administered the standard preinterrogation warnings. The defendant told the officers that he and another friend, Joe Bush, had just returned from a four- or five-day trip "upstate someplace” and learned of Geller’s death only upon his return. Since Bush was also a suspect in the case and defendant admitted knowing Bush, defendant agreed to accompany the officers to the station house for the purposes of identifying photographs of Bush and of lending assistance to the investigation. Upon arrival at the police station, Detective Carrasquillo and the defendant went directly into an interview room. Carrasquillo advised the defendant that he had witnesses and information to the effect that as late as 7:00 p.m. on the day before the body was found, defendant had been observed carrying a .25 caliber pistol. Once again, Carrasquillo administered the standard preinterrogation statement of rights. The defendant then proceeded to relate his version of the events which culminated in the death of Geller. Defendant stated that, on the night of December 21, 1973, he, Bush and Geller had been out drinking. Bush had been staying at Geller’s apartment and, during the course of the evening, Geller several times demanded that Bush pay $100 towards the rent on the apartment. According to defendant, Bush rejected these demands, telling Geller that "you better shut up or you’re going to get a bullet”. All three returned to Geller’s apartment at approximately midnight, took seats in the bedroom, and continued to drink until sometime between 3:00 and 3:30 in the morning. When Geller again pressed his demand for rent money, Bush drew his .38 caliber pistol, aimed it at Geller and fired three times. Geller fell to the floor. After the passage of a few minutes, perhaps two, perhaps as much as five, defendant walked over to the fallen Geller, drew his .25 caliber pistol, and fired approximately five shots in the victim’s head and face. Defendant contended that, by the time he fired the shots, "it looked like Mike Geller was already dead”. After the shots were fired, defendant and Bush walked to the apartment of a female acquaintance. Bush removed his shirt, wrapped the two guns and a knife in it, and left the apartment, telling Dlugash that *729 he intended to dispose of the weapons. Bush returned 10 or 15 minutes later and stated that he had thrown the weapons down a sewer two or three blocks away.
After Carrasquillo had taken the bulk of the statement, he asked the defendant why he would do such a thing. According to Carrasquillo, the defendant said, "gee, I really don’t know”. Carrasquillo repeated the question 10 minutes later, but received the same response. After a while, Carrasquillo asked the question for a third time and defendant replied, "well, gee, I guess it must have been because I was afraid of Joe Bush.”
At approximately 9:00 p.m., the defendant repeated the substance of his statement to an Assistant District Attorney. Defendant added that the time he shot at Geller, Geller was not moving and his eyes were closed. While he did not check for a pulse, defendant stated that Geller had not been doing anything to him at the time he shot because "Mike was dead”.
Defendant was indicted by the Grand Jury of Kings County on a single count of murder in that, acting in concert with another person actually present, he intentionally caused the death of Michael Geller. At the trial, there were four principal prosecution witnesses: Detective Carrasquillo, the Assistant District Attorney who took the second admission, and two physicians from the office of the New York City Chief Medical Examiner. For proof of defendant’s culpability, the prosecution relied upon defendant’s own admissions as related by the detective and the prosecutor. From the physicians, the prosecution sought to establish that Geller was still alive at the time defendant shot at him. Both physicians testified that each of the two chest wounds, for which defendant alleged Bush to be responsible, would have caused death without prompt medical attention. However, the victim would have remained alive until such time as his chest cavity became fully filled with blood. Depending on the circumstances, it might take 5 to 10 minutes for the chest cavity to fill. Neither prosecution witness could state, with medical certainty, that the victim was still alive when, perhaps five minutes after the initial chest wounds were inflicted, the defendant fired at the victim’s head.
The defense produced but a single witness, the former Chief Medical Examiner of New York City. This expert stated that, in his view, Geller might have died of the chest wounds "very rapidly” since, in addition to the bleeding, a large bullet going through a lung and the heart would have other adverse medical effects. "Those wounds can be almost immediately or *730 rapidly fatal or they may be delayed in there, in the time it would take for death to occur. But I would say that wounds like that which are described here as having gone through the lungs and the heart would be fatal wounds and in most cases they’re rapidly fatal.”
The trial court declined to charge the jury, as requested by the prosecution, that defendant could be guilty of murder on the theory that he had aided and abetted the killing of Geller by Bush. Instead, the court submitted only two theories to the jury: that defendant had either intentionally murdered Geller or had attempted to murder Geller.
The jury found the defendant guilty of murder. The defendant then moved to set the verdict aside. He submitted an affidavit in which he contended that he "was absolutely, unequivocally and positively certain that Michael Geller was dead before [he] shot him.” Further, the defendant averred that he was in fear for his life when he shot Geller. "This fear stemmed from the fact that Joseph Bush, the admitted killer of Geller, was holding a gun on me and telling me, in no uncertain terms, that if I didn’t shoot the dead body I, too, would be killed.” This motion was denied.[1]
On appeal, the Appellate Division reversed the judgment of conviction on the law and dismissed the indictment. The court ruled that "the People failed to prove beyond a reasonable doubt that Geller had been alive at the time he was shot by defendant; defendant’s conviction of murder thus cannot stand.” (51 AD2d 974, 975.) Further, the court held that the judgment could not be modified to reflect a conviction for attempted murder because "the uncontradicted evidence is that the defendant, at the time he fired the five shots into the body of the decedent, believed him to be dead, and * * * there is not a scintilla of evidence to contradict his assertion in that regard” (51 AD2d, at p 975).
Preliminarily, we state our agreement with the Appellate Division that the evidence did not establish, beyond a reason *731 able doubt, that Geller was alive at the time defendant fired into his body. To sustain a homicide conviction, it must be established, beyond a reasonable doubt, that the defendant caused the death of another person. (Penal Law, § 125.00; CPL 70.20.) The People were required to establish that the shots fired by defendant Dlugash were a sufficiently direct cause of Geller’s death. (People v Stewart, 40 NY2d 692, 697; People v Kibbe, 35 NY2d 407, 412.) While the defendant admitted firing five shots at the victim approximately two to five minutes after Bush had fired three times, all three medical expert witnesses testified that they could not, with any degree of medical certainty, state whether the victim had been alive at the time the latter shots were fired by the defendant. Thus, the People failed to prove beyond a reasonable doubt that the victim had been alive at the time he was shot by the defendant. Whatever else it may be, it is not murder to shoot a dead body. (State v Simpson, 244 NC 325, 333.) Man dies but once.
Before turning to an analysis of the attempt issue, there is a further point to be made. A person may be criminally liable for the criminal conduct of another person when, "acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.” (Penal Law, § 20.00.) We believe that the evidence in the record would support a reasonable inference that Dlugash intentionally aided Bush in killing Geller and destroying telltale evidence. However, the trial court refused to permit the jury to consider this theory and the question of accessorial liability is, therefore, out of the case. The court dismissed the murder count insofar as it reflected accessorial liability, an action which may be taken only by a trial order of dismissal. (CPL 300.40; see CPL 290.10.) We have held that the People may not appeal trial orders of dismissal "where retrial of the defendant, or indeed any supplemental fact finding, might result from appellate reversal of the order sought to be appealed.” (People v Brown, 40 NY2d 381, 393.) Thus, in this case, we are without authority to direct a new trial. The judgment must stand or fall on the present record. Since the record fails to support a conviction for intentional murder, if the evidence also fails to support a conviction for attempted murder as a matter of law, the defendant is free of all liability.
The procedural context of this matter, a nonappealable but erroneous dismissal of the issue of accessorial conduct, contrib *732 utes to the unique nature of the attempt issue presented here. Where two or more persons have combined to murder, proof of the relationship between perpetrators is sufficient to hold all for the same degree of homicide, notwithstanding the absence of proof as to which specific act of which individual was the immediate cause of the victim’s death. (Cf. People v Benzinger, 36 NY2d 29, 34.) On the other hand, it is quite unlikely and improbable that two persons, unknown and unconnected to each other, would attempt to kill the same third person at the same time and place. Thus, it is rare for criminal liability for homicide to turn on which of several attempts actually succeeded. In the case of coconspirators, it is not necessary to do so and the case of truly independent actors is unlikely. However, procedural developments make this case the unlikely one and we must now decide whether, under the evidence presented, the defendant may be held for attempted murder, though someone else perhaps succeeded in killing the victim.
The concept that there could be criminal liability for an attempt, even if ultimately unsuccessful, to commit a crime is comparatively recent. The modern concept of attempt has been said to date from Rex v Scofield (Cald 397), decided in 1784. (Sayre, Criminal Attempts, 41 Harv L Rev 821, 834.) In that case, Lord Mansfield stated that "[t]he intent may make an act, innocent in itself, criminal; nor is the completion of an act, criminal in itself, necessary to constitute criminality. Is it no offence to set fire to a train of gunpowder with intent to burn a house, because by accident, or the interposition of another, the mischief is prevented?” (Cald, at p 400; see, also, Commonwealth v Kennedy, 170 Mass 18 [Holmes, J.].) The Revised Penal Law now provides that a person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime. (Penal Law, § 110.10.) The revised statute clarified confusion in the former provision which, on its face, seemed to state that an attempt was not punishable as an attempt unless it was unsuccessful. (See Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 110.00, pp 309-310.)
The most intriguing attempt cases are those where the attempt to commit a crime was unsuccessful due to mistakes of fact or law on the part of the would-be criminal. A general rule developed in most American jurisdictions that legal im *733 possibility is a good defense but factual impossibility is not. (See Conspiracy, Attempt-Crime Impossible, Ann., 37 ALR3d 375, 381; see, also, What Constitutes Attempted Murder, Ann., 54 ALR3d 612, 633.) Thus, for example, it was held that defendants who shot at a stuffed deer did not attempt to take a deer out of season, even though they believed the dummy to be a live animal. The court stated that there was no criminal attempt because it was no crime to "take” a stuffed deer, and it is no crime to attempt to do that which is legal. (State v Guffey, 262 SW2d 152 [Mo]; see, also, State v Taylor, 345 Mo 325 [no liability for attempt to bribe a juror where person bribed was not, in fact, a juror].) These cases are illustrative of legal impossibility. A further example is Francis Wharton’s classic hypothetical involving Lady Eldon and her French lace. Lady Eldon, traveling in Europe, purchased a quantity of French lace at a high price, intending to smuggle it into England without payment of the duty. When discovered in a customs search, the lace turned out to be of English origin, of little value and not subject to duty. The traditional view is that Lady Eldon is not liable for an attempt to smuggle. (1 Wharton, Criminal Law [12th ed], § 225, p 304, n 9; for variations on the hypothetical see Hughes, One Further Footnote on Attempting the Impossible, 42 NYU L Rev 1005.)
On the other hand, factual impossibility was no defense. For example, a man was held liable for attempted murder when he shot into the room in which his target usually slept and, fortuitously, the target was sleeping elsewhere in the house that night. (State v Mitchell, 170 Mo 633.) Although one bullet struck the target’s customary pillow, attainment of the criminal objective was factually impossible. State v Moretti (52 NJ 182, cert den 393 US 952) presents a similar instance of factual impossibility. The defendant agreed to perform an abortion, then a criminal act, upon a female undercover police investigator who was not, in fact, pregnant. The court sustained the conviction, ruling that "when the consequences sought by a defendant are forbidden by the law as criminal, it is no defense that the defendant could not succeed in reaching his goal because of circumstance unknown to him.” (52 NJ, at p 190; see, also, People v Camodeca, 52 Cal 2d 142, 146-147.) On the same view, it was held that men who had sexual intercourse with a woman, with the belief that she was alive and did not consent to the intercourse, could be charged for attempted rape when the woman had, in fact, died from an *734 unrelated ailment prior to the acts of intercourse. (United States v Thomas, 13 USCMA 278.)
The New York cases can be parsed out along similar lines. One of the leading cases on legal impossibility is People v Jaffe (185 NY 497) in which we held that there was no liability for the attempted receipt of stolen property when the property received by the defendant in the belief that it was stolen was, in fact, under the control of the true owner. (Accord People v Rollino, 37 Misc 2d 14; Booth v State, 398 P2d 863 [Okla]; United States v Hair, 356 F Supp 339.) Similarly, in People v Teal (196 NY 372), a conviction for attempted subornation of perjury was overturned on the theory that the testimony attempted to be suborned was irrelevant to the merits of the case. Since it was not subornation of perjury to solicit false, but irrelevant, testimony, "the person through whose procuration the testimony is given cannot be guilty of subornation of perjury and, by the same rule, an unsuccessful attempt to that which is not a crime when effectuated, cannot be held to be an attempt to commit the crime specified.” (196 NY, at p 377.) Factual impossibility, however, was no defense. Thus, a man could be held for attempted grand larceny when he picked an empty pocket. (People v Moran, 123 NY 254; see, also, People v Bauer, 32 AD2d 463, 468, affd 26 NY2d 915.)
As can be seen from even this abbreviated discussion, the distinction between "factual” and "legal” impossibility was a nice one indeed and the courts tended to place a greater value on legal form than on any substantive danger the defendant’s actions posed for society. The approach of the draftsmen of the Model Penal Code was to eliminate the defense of impossibility in virtually all situations. Under the code provision, to constitute an attempt, it is still necessary that the result intended or desired by the actor constitute a crime. However, the code suggested a fundamental change to shift the locus of analysis to the actor’s mental frame of reference and away from undue dependence upon external considerations. The basic premise of the code provision is that what was in the actor’s own mind should be the standard for determining his dangerousness to society and, hence, his liability for attempted criminal conduct. (Wechsler, Jones and Korn, Treatment of Inchoate Crimes in Model Penal Code of American Law Institute: Attempt, Solicitation and Conspiracy, 61 Col L Rev 571, 578-585; see, also, American Law Institute, Model *735 Penal Code [Tent Draft No. 10], Comments to § 5.01—Criminal Attempt, pp 30-38.)
In the belief that neither of the two branches of the traditional impossibility arguments detracts from the offender’s moral culpability (see Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 110.10, p 320), the Legislature substantially carried the code’s treatment of impossibility into the 1967 revision of the Penal Law. (See, also, Note, Proposed Penal Law of New York, 64 Col L Rev 1469, 1520-1521.) Thus, a person is guilty of an attempt when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime. (Penal Law, § 110.00.) It is no defense that, under the attendant circumstances, the crime was factually or legally impossible of commission, "if such crime could have been committed had the attendant circumstances been as such person believed them to be.” (Penal Law, § 110.10.) Thus, if defendant believed the victim to be alive at the time of the shooting, it is no defense to the charge of attempted murder that the victim may have been dead.
Turning to the facts of the case before us, we believe that there is sufficient evidence in the record from which the jury could conclude that the defendant believed Geller to be alive at the time defendant fired shots into Geller’s head. Defendant admitted firing five shots at a most vital part of the victim’s anatomy from virtually point blank range. Although defendant contended that the victim had already been grievously wounded by another, from the defendant’s admitted actions, the jury could conclude that the defendant’s purpose and intention was to administer the coup de grace. The jury never learned of defendant’s subsequent allegation that Bush had a gun on him and directed defendant to fire at Geller on the pain of his own life. Defendant did not testify and this statement of duress was made only in a postverdict affidavit, which obviously was never placed before the jury. In his admissions that were related to the jury, defendant never made such a claim. Nor did he offer any explanation for his conduct, except for an offhand aside made casually to Detective Carrasquillo. Any remaining doubt as to the question of duress is dispelled by defendant’s earlier statement that he and Joe Bush had peacefully spent a few days together on vacation in the country. Moreover, defendant admitted to freely assisting Bush in disposing of the weapons after the *736 murder and, once the weapons were out of the picture, defendant made no effort at all to flee from Bush. Indeed, not only did defendant not come forward with his story immediately, but when the police arrived at his house, he related a false version designed to conceal his and Bush’s complicity in the murder. All of these facts indicate a consciousness of guilt which defendant would not have had if he had truly believed that Geller was dead when he shot him.
Defendant argues that the jury was bound to accept, at face value, the indications in his admissions that he believed Geller dead. Certainly, it is true that the defendant was entitled to have the entirety of the admissions, both the inculpatory and the exculpatory portions, placed in evidence before the trier of facts. (E.g., People v La Belle, 18 NY2d 405, 410-411; People v Gallo, 12 NY2d 12, 15; Richardson, Evidence [10th ed], § 227, p 202.) However, the jury was not required to automatically credit the exculpatory portions of the admissions. The general rule is, of course, that the credibility of witnesses is a question of fact and the jury may choose to believe some, but not all, of a witness’ testimony. (E.g., People v Reed, 40 NY2d 204, 208.) The general rule applies with equal force to proof of admissions. Thus, it has been stated that "where that part of the declaration which discharges the party making it is itself highly improbable or is discredited by other evidence the [jury] may believe one part of the admission and reject the other.” (People ex rel. Perkins v Moss, 187 NY 410, 428.) In People v Miller (247 App Div 489, 493), relied upon by defendant, Justice Lewis (later Chief Judge) concluded that the damaging aspects of an admission should not be accepted and the exculpatory portion rejected "unless the latter is disputed by other evidence in the case, or is so improbable as to be unworthy of belief’ (emphasis added). In this case, there is ample other evidence to contradict the defendant’s assertion that he believed Geller dead. There were five bullet wounds inflicted with stunning accuracy in a vital part of the victim’s anatomy. The medical testimony indicated that Geller may have been alive at the time defendant fired at him. The defendant voluntarily left the jurisdiction immediately after the crime with his coperpetrator. Defendant did not report the crime to the police when left on his own by Bush. Instead, he attempted to conceal his and Bush’s involvement with the homicide. In addition, the other portions of defendant’s admissions make his contended belief that Geller *737 was dead extremely improbable. Defendant, without a word of instruction from Bush, voluntarily got up from his seat after the passage of just a few minutes and fired five times point blank into the victim’s face, snuffing out any remaining chance of life that Geller possessed. Certainly, this alone indicates a callous indifference to the taking of a human life. His admissions are barren of any claim of duress[2] and reflect, instead, an unstinting co-operation in efforts to dispose of vital incriminating evidence. Indeed, defendant maintained a false version of the occurrence until such time as the police informed him that they had evidence that he lately possessed a gun of the same caliber as one of the weapons involved in the shooting. From all of this, the jury was certainly warranted in concluding that the defendant acted in the belief that Geller was yet alive when shot by defendant.
The jury convicted the defendant of murder. Necessarily, they found that defendant intended to kill a live human being. Subsumed within this finding is the conclusion that defendant acted in the belief that Geller was alive. Thus, there is no need for additional fact findings by a jury. Although it was not established beyond a reasonable doubt that Geller was, in fact, alive, such is no defense to attempted murder since a murder would have been committed "had the attendant circumstances been as [defendant] believed them to be.” (Penal Law, § 110.10.) The jury necessarily found that defendant believed Geller to be alive when defendant shot at him.
The Appellate Division erred in not modifying the judgment to reflect a conviction for the lesser included offense of attempted murder. An attempt to commit a murder is a lesser included offense of murder (see CPL 1.20, subd 37) and the Appellate Division has the authority, where the trial evidence is not legally sufficient to establish the offense of which the defendant was convicted, to modify the judgment to one of conviction for a lesser included offense which is legally established by the evidence. (CPL 470.15, subd 2, par [a]; 470.20, subd 4.) Thus, the Appellate Division, by dismissing the indictment, failed to take the appropriate corrective action. Further, questions of law were erroneously determined in favor of *738 the appellant at the Appellate Division. While we affirm the order of the Appellate Division to the extent that the order reflects that the judgment of conviction for murder cannot stand, a modification of the order and a remittal for further proceedings is necessary. (CPL 470.40, subds 2, 3.)
Accordingly, the order of the Appellate Division should be modified and the case remitted to the Appellate Division for its review of the facts pursuant to CPL 470.15 (see CPL 470.25, subd 2, par [d]) and for further proceedings with respect to the sentence (see CPL 470.20, subd 4) in the event that the facts are found favorably to the People. As so modified, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order modified and the case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

. It should be noted that Joe Bush pleaded guilty to a charge of manslaughter in the first degree. At the time he entered his plea, Bush detailed his version of the homicide. According to Bush, defendant Dlugash was a dealer in narcotic drugs and Dlugash claimed that Geller owed him a large sum of money from drug purchases. Bush was in the kitchen alone when Geller entered and threatened him with a shotgun. Bush pulled out his .38 caliber pistol and fired five times at Geller. Geller slumped to the floor. Dlugash then entered, withdrew his .25 caliber pistol and fired five shots into the deceased’s face. Bush, however, never testified at Dlugash’s trial.

. Notwithstanding the Appellate Division’s implication to the contrary, the record indicates that defendant told the Assistant District Attorney that Bush, after shooting Geller, kept his gun aimed at Geller, and not at Dlugash. As defendant stated, "this was after Joe had his .38 on him, I started shooting on him.”